**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DEBORAH MAPLES, et al.,** | ) | |
| | ) | **No. 07 C 6725** |
| | ) | |
| **Plaintiffs,** | ) | **Judge Castillo** |
| | ) | **Magistrate Judge Nolan** |
| | ) | |
| **ILLINOIS BELL TELEPHONE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANT'S SUMMARY JUDGMENT MOTION**

Plaintiffs DEBORAH MAPLES, DONNA STONER, GRACE RIVERA, LOUELLA BYRNES, and MICHAEL O'CONNOR, through their attorneys Dowd, Bloch & Bennett, submit this Memorandum of Law in support of their Motion for Partial Summary Judgment. [1]

The individual plaintiffs are defendant's employees and union stewards who spend most of their days performing activities associated with adjusting grievances. Steward duties are performed while on authorized leave from regular work duties. The parties agree that all of such steward time spent in face-to-face meetings with management representatives, which is authorized under Section 11.06 of the labor agreement and recorded by defendant under the time code "MXUP," is counted toward satisfying the requirement that employees have 1,250-hours of

---

[1] Plaintiff Lavonne Purkey has moved to dismiss her complaint against the Defendant.

service in the 12-month period prior to a leave request under the Family and Medical Leave Act of 1993 ("FMLA").  29 U.S.C. § 2611(2)(A).  The threshold issue before this Court is whether the plaintiff stewards' time spent in these activities other than in face-to-face meetings with management, including investigating and evaluating grievances, preparing for meetings, and follow-up activities, which is authorized leave under Section 11.09 of the labor agreement and time-coded by defendant as "MXUU," must also be credited toward the FMLA's 1,250-hour eligibility requirement.

Defendant Illinois Bell Telephone Company ("Illinois Bell" or "Company") pays stewards' wages for all MXUP time.  Local No. 21 pays the stewards' wages for MXUU time, though Illinois Bell credits MXUU hours toward overtime earned with the Company.  Thus, in the course of a workweek if a steward performs 20 hours of regular work for the Company, 10 MXUP hours, and 10 MXUU hours, any additional regular work by a plaintiff steward for the Company during the same workweek is paid the overtime rate of time and one-half the base wage rate, notwithstanding that the Company did not pay all of the wages for the first 40 hours of work.  The Company credits both MXUP and MXUU time for all Company-provided fringe benefits and certain bonus awards.  (Plaintiffs' Statement of Facts ("SOF"), ¶¶ 6, 8, 9).

Since at least 1998 (and possibly since 1993) and until mid-2005, Illinois Bell counted both MXUP and MXUU time toward the FMLA 1,250-hour eligibility requirement.  Most of the plaintiff stewards were granted FMLA leave on several occasions prior to 2005 by virtue of the Company crediting their MXUU and MXUP time toward FMLA eligibility.  But in mid-2005, without warning or notice to the Union, the Company stopped crediting MXUU time toward FMLA eligibility, and commencing in December 2005 the plaintiff stewards became the first employees to be denied FMLA coverage based on excluding MXUU hours toward FMLA

2

eligibility.  The Company made no other changes regarding the treatment of MXUP and MXUU time. (SOF, ¶¶24, 25, 28).

Because the plaintiffs expend a significant amount of time each year on MXUU time, though less than 1250 hours, the result of the Company's 2005 action is that Plaintiff stewards are now entirely ineligible for FMLA benefits, either through the Company or the Union. Although as employees of both the Company and Union they work and are compensated in the aggregate as full-time employees, under the Company's new accounting they do not work at least 1,250 hours for either entity. (SOF, ¶ 14)


Stewards' duties benefit both the Union and Illinois Bell

Companies and unions like Illinois Bell and Local 21 that have longstanding, mature collective bargaining relationships maintain voluntary arrangements whereby stewards devote much or all of their time toward contract enforcement matters such as grievance adjustment. These stewards are more than mere union mouthpieces or employer irritants: they work to the mutual and simultaneous benefit of both company and union by overseeing proper enforcement of labor agreements and maintaining industrial peace.

Stewards' service to both company and union has judicial recognition.  The Ninth Circuit Court of Appeals in *Int'l. Assn of Machinists v. BF Goodrich Aerospace*, 387 F.3d 1046 (9th Cir. 2004), considered the legality of employers paying chief union stewards' salaries. The Court agreed with the contention that the steward

> really does serve the interests of the employer.  Although he may not be
> operating machinery, the Chief Shop Steward plays an integral role in enforcing
> the terms of the collective bargaining agreement and in peacefully resolving
> disputes between labor and management – helping both parties avoid expensive
> and time-consuming litigation and the constant threat of work stoppages. . . .
> [T]he Chief Shop steward's work – even in his capacity as a union

3

> representative – serves the company's interests. There is, in short, a reason why virtually every single collective bargaining agreement in this country contains a grievance mechanism and why nearly all of them provide for union representation in the course of that process: Services rendered by union stewards benefit union and corporation alike.

*Id.* at 1057-58. Similarly, the Sixth Circuit Court of Appeals in *Douglas v. Argo-Tech Corp.*, 113 F.3d 67 (6th Cir. 1997), considered the role of a union official who was paid by the company to work full time on matters of labor contract enforcement. It found that

> [b]enefit to the Union and benefit to [the Company] resulting from [steward's] activities are not mutually exclusive. . . . A labor force secure in the belief that [the Company] is treating its members fairly and in accordance with the bargaining agreement is likely to be more productive. This is an obvious benefit to [the Company].

*Id.* at 72. The plaintiff stewards here serve the same role for both Illinois Bell and Local 21: They ensure labor harmony through proper enforcement of the labor contract.

## I. ILLINOIS BELL AND LOCAL 21 ARE JOINT EMPLOYERS OF PLAINTIFF STEWARDS, WHOSE HOURS OF SERVICE FOR BOTH ENTITIES ARE AGGREGATED TO DETERMINE FMLA ELIGIBILITY.

### A. Illinois Bell and Local 21 are joint employers within the meaning of United States Department of Labor ("DOL") regulations.

Illinois Bell and Local 21 are joint employers within the meaning of the FMLA because they have an agreement to share the services of the stewards, including plaintiffs, who are employed both by Illinois Bell and Local 21. [2] Under that agreement, the Stewards work for

---

[2] Plaintiffs submit that whether the joint employment determination is made on an employee-by-employee basis or on the basis of the class of employees to which the stewards belong the outcome is the same—Local 21 and Illinois Bell are joint employers of the plaintiffs. At least one court dealing with this issue in the Title VII context stated that whether the Union and the Company are joint employers is based on their relationship with the class of employees to which the plaintiffs belong–it is not an employee-by-employee determination. *Sandoval v. Boulder Regional Communications Center*, 388 F.3d 1312, 1324 (10th Cir. 2001) ("joint employer status is determined by focusing on the entities' relationships to a given employee or class of

4

Illinois Bell and Local 21 at different times during the workweek.  Because Illinois Bell and Local 21 are joint employers within the meaning of the FMLA, the hours worked for both entities are aggregated to determine whether the plaintiffs meet the 1,250-hour of service requirement. 29 C.F.R. § 825.106(d). [3]

The FMLA does not define or even refer to joint employment.  But the FMLA directs in Section 101(2)(C) that the "hours of service" requirement under FMLA be determined by reference to the "hours worked" requirement under the Fair Labor Standards Act ("FLSA").  To this end, DOL drafted an FMLA joint employment regulation, 29 C.F.R. § 825.106, that is nearly identical to the FLSA joint employment regulation, 29 C.F.R. § 791.2.

When viewed on its face, Local 21 and Illinois Bell fall comfortably within the regulation's definition of a joint employer under the FMLA, which provides:

> (a) Where two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA. Joint employers may be separate and distinct entities with separate owners, managers and facilities. Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship will be considered to exist in such situations as:
>
> (1) Where there is an arrangement between employers to share an employee's services or to interchange employees;
>
> (2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

employees").  The analysis here as to whether Illinois Bell and Local 21 are joint employers is based on their relationship with all stewards employed by both entities.

[3] See also Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, FMLA-37, 1994 DOL FMLA LEXIS 14 (July 7, 1994)(time spent working for temporary help agency and company combined to determine eligibility under 1,250-hour test); *Salgado v. CDW Computer Centers, Inc.*, No. 97 C 1975, 1998 U.S. Dist. LEXIS 1374, at *10-12  (N.D. Ill. February 4, 1998)(employment by both joint employers considered in determining whether the plaintiff employee met the 12-month employment requirement for FMLA eligibility); *Miller v. Defiance Metal Products, Inc.*, 989 F. Supp. 945, 946 (N.D. Ohio 1997)(same).

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

(b) A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality. For example, joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer.

29 C.F.R. § 825.106.

The regulation effectively requires that two businesses either employ or control the employment of an employee, that the employee either works for both entities or the employee's work simultaneously benefit both entities, and that the entities maintain some sort of connection to one another either in relation to the employee or through corporate control.

Both Local 21 and Illinois Bell are "businesses" within the meaning of the regulation, though the use of the term "businesses" in this regulation is an anomaly. Neither the FMLA nor the corresponding DOL regulations refer to, define or otherwise use the term "business." Rather, the term typically used is "employer." The Plaintiffs submit that the term "business" and "employer" are synonymous for the purpose of this regulation. The corresponding FLSA joint employment regulation, which also uses the term "businesses" when referring to joint employment, has been applied to government entities despite the fact that such entities are not "businesses." *See, e.g., Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983)(state and county agencies are joint employers); *Cox v. The Town of Poughkeepsie*, 209 F. Supp. 2d 319, 324 (SD N.Y. 2002) (town court and town police are joint employers). The same finding is appropriate here.[4]

---

[4] Even if the terms "business" and "employer" are not synonymous, both Local 21 and Illinois Bell are "businesses." Local 21 is an unincorporated association with a place of business in

There is no dispute that the plaintiff stewards are employed both by Illinois Bell and Local 21. Illinois Bell and Local 21 are separate and distinct entities but both "exercise some control over the work or working conditions" of the plaintiffs.   During the period when stewards perform their regular work duties, Illinois Bell exerts exclusive control over their working conditions.  During periods when stewards perform MXUU and MXUP time, both Local 21 and Illinois Bell exert control over their working conditions.  (SOF, ¶¶ 1, 16, 17).

The regulation next specifies that a joint employment relationship may exist where an employee either "performs work which simultaneously benefits two or more employers," or the employee "works for two or more employers at different times during the workweek."  The Plaintiffs here fulfill both requirements. As discussed above, the stewards' contract enforcement duties benefit both Union and Company alike.  *See Machinists,* 387 F.3d 1046;  *Argotech*, 113 F.3d 67. [5]  Further, the stewards' time is divided between Illinois Bell and Local 21.  Stewards perform both Company-paid MXUP duties and Union-paid MXUU duties during the same

---

Downers Grove, Illinois, where it is engaged in the business of representing employees in bargaining with employers with respect to wages, hours, and other terms and conditions of employment. (SOF, ¶2); *In re James Porterfield*, 168 P.2d 706, 712 (Cal. 1946)(municipality may impose business regulations on union activity: "The mere fact that labor unions are treated in the Labor Code and professions in general by the Business and Professions Code does not mean that the act of an employe [sic] of a labor union in soliciting workers to become members of a particular union does not constitute engaging in an occupation or business subject to license for purposes of regulation or revenue."). The National Labor Relations Board recognizes that local unions are engaged in commerce through their affiliation with their international unions and are thus subject to its jurisdiction under 29 U.S.C. § 152(7);  *Kansas AFL-CIO*, 341 N.L.R.B. 1015, 1017 (2004); *Carpenters Local 925*, 279 N.L.R.B. 1051, 1052 (1986).  Local 21 remits annual dues and assessments to the International Brotherhood of Electrical Workers located in Washington, D.C. in excess of $1 million and is, therefore, involved in commercial activity sufficient to meet the jurisdictional requirements of the National Labor Relations Act. (SOF, ¶ 15).

[5] *See also* Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, 1965 DOLWH LEXIS 244 (December 28, 1965) (union employees meetings with management to handle day-to-day problems serves the employer's interest in the "continuous harmonious operation of the business.")

workweek.  Some stewards also perform regular work duties for the Company in addition to steward duties during a workweek.  (SOF, ¶ 13).

Having satisfied the initial requirement to work for, or for the benefit of, both entities, the Plaintiffs also meet at least one of the specific examples for identifying a joint employment relationship.

Though the regulation requires only an "arrangement" to share employee services, the Company and Union have more:  a formal written agreement to share services embedded in their collective bargaining agreement ("CBA").  It provides, in relevant part:

> 11.06   For purposes of processing grievances, the Company agrees to permit authorized Union representatives to confer with representatives of the Company without loss of pay during such employees' regularly scheduled work hours.

> 11.09   The Company, insofar as work schedules permit, agrees to grant to any employee who is an Officer or properly designated representative of the Union the necessary time off without pay to transact business of the Union, provided the Company is given reasonable advance notice of such absence.

As authorized by the CBA, Local 21 and Illinois Bell share the Stewards' services during the workweek.  (SOF, ¶ 5, 7, 13). [6]

Other factors further demonstrate the joint employment relationship between the Company and Union with regard to stewards.  At Illinois Bell, the Local 21 does not select stewards from outside the workforce and appoint them to a Company position.  Rather,  Local 21 can only hire as stewards individuals that Illinois Bell chooses to employ, and the steward must

---

[6] Even without a written agreement, the fact of sharing an employee's services is sufficient to establish a joint employment relationship under the FMLA.  *McLaughlin v. Lunde Truck Sales, Inc.*, 714 F. Supp. 920, 924-925 (N.D. Ill. 1989).  *See also Slover v. Wathen*, 140 F.2d 258 (4th Cir. 1944); *Mid-Continent Pipe Line Co. v. Hargrave*, 129 F.2d 655, 658-659 (10th Cir. 1942); *Moon v. Kwon*, 248 F. Supp. 2d 201, 238 (S.D. N.Y. 2002); *Martin v. Universal Alarm Systems, Inc.*, No. 91-6372, 1992 U.S. Dist. LEXIS 12565, at *3-5 (E.D. Pa. August 21, 1992); *Donovan v. Eugene Harper*, No. 81-1049, 1984 U.S. Dist. LEXIS 20145, at *1-4 (W.D. La. January 24, 1984).

serve in the same department to which the Company assigns him or her to work. Should Illinois Bell discharge a steward from employment, the individual may no longer serve as a steward. (SOF, ¶¶ 19, 20, 21).    Further, as discussed above, by agreement between the Company and Union, the parties share responsibility for payment of steward time spent in contract enforcement activities. Illinois Bell pays fringe benefits on both MXUP and MXUU time, and it pays wages on MXUP time. The Union pays wages on MXUU time, but the Company credits all MXUU time toward accruing overtime wages after 40 hours of weekly work. (SOF, ¶ 6, 8, 9). Two unrelated employers would never combine their employees' hours for purposes of accruing overtime with only one employer, nor would they allow one employer to exert control over hiring and firing by the other employer. These facts show that the Stewards' employment with Local 21 and Illinois Bell is intimately interrelated and thus show that their employment by the two entities is joint employment.

The FLSA joint employment regulation further reinforces this joint employer finding. "[B]ecause the [FLSA] is 'remedial and humanitarian in purpose,'. . . it should be broadly interpreted and applied to effectuate its goals." *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999) quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, (1944). Joint employment standards under the FLSA likewise are to be interpreted broadly. The Seventh Circuit instructs in *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1207 (7th Cir. 1986), that "we need to give this concept [joint employment] an expensive interpretation in order to effectuate Congress's remedial intent in enacting the FLSA." See also *Chao v. A-One Medical Services*, 346 F.3d 908 (9th Cir. 2003). [7]

---

[7] In determining whether entities are joint employers within meaning of FMLA, if there is no FMLA case law on point, courts look to joint employment case law and DOL guidance under the FLSA. *See* Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, FMLA-111, 2000

Under the FLSA, DOL determined long ago that a union and an employer are "joint employers" of employees engaging in contract enforcement activities that are employed by both entities.  In 1965, DOL considered whether union-compensated time spent in labor-management committee meetings during regular working hours is considered hours worked for overtime pay purposes under the FLSA.  DOL concluded that,

> [i]f the employee's attendance at such a [labor-management] meeting may be viewed as employment by the union (see act, section 3(d)) and his services simultaneously benefit his regular employer, the time must nevertheless be counted as hours worked for overtime pay purposes, but the regular employer may take credit for the payments made to the employee by the union.  *See 29 C.F.R. 791.2* (emphasis supplied).

Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, 1965 DOLWH LEXIS 244 (December 28, 1965).  Significantly, in making its finding, DOL cited Regulation 29 C.F.R. § 791.2 -- the FLSA joint employment regulation.  Thus, DOL concluded that unions and employers are joint employers where part of the employees' salary is paid by the union and the other part paid by the employer – the same scenario in this case.  DOL opinions – wholly ignored by Illinois Bell – are entitled to deference in interpreting DOL's own regulations if those regulations are ambiguous.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Christensen v. Harris County*, 529 U.S. 576, 588 (2000); *In Re Wal-Mart Stores, Inc.*, 395 F.3d 1177, 1184-85 (10th Cir. 2005).

Viewed in its totality as required by 29 C.F.R. § 825.106(b), the relationship between Illinois Bell and Local 21 with respect to the stewards must be found to be joint employment.  Both entities employ the stewards and both entities control aspects of the stewards' employment.  Both entities benefit from the stewards' services and by agreement they share the stewards' time.

DOL FMLA LEXIS 4 (September 11, 2000); *See also Moldenhauer v. Tazewell-Pekin*, No. 04-1169, 2006 U.S. Dist. LEXIS 93896, at *23-25 (C.D. Ill. December 29, 2006).

**B.**     **The Company is the primary employer and solely responsible for providing FMLA benefits to the plaintiff stewards.**

In joint employment relationships, only the "primary employer" is responsible for providing FMLA leave and maintenance of health benefits.  29 C.F.R. § 825.106(c). [8]  The primary employer is identified by the following factors: "authority/responsibility to" (1) "hire and fire;" (2) "assign/place employee;" (3) "make payroll;" and (4) "provide employment benefits."  *Id.* Because Illinois Bell has the primary authority in these matters, it is the primary employer.

As mentioned above, the Company ultimately controls hiring and firing of stewards, directly or indirectly, by controlling the pool of individuals eligible to serve as stewards.  (SOF, ¶¶ 19, 20).  The Company also has the primary responsibility for assigning and placing the employees.   It assigns and places them for purposes of performing regular work duties. When employees become stewards, they must remain in their existing department.  The Union can direct the work that the stewards perform, and the stewards can report to the Union office with notice to the Company, but the Union cannot re-assign the stewards to different departments– only the Company has such power.  The Company may also transfer employees over the Union's objection.  The involuntary transfer of an employee/steward to another department can force the Union to fire the steward because that steward can no longer serve the employees in the steward's original department. (SOF, ¶¶ 21, 22).

Both the Company and the Union make payroll for employee stewards, but the Company alone has sole responsibility for providing nearly all employee benefits.  Under the CBA, the

---

[8] Unlike the FLSA, where the liability of the employers is joint and several, (see 29 C.F.R. § 791.2(a)),  FMLA liability for leave and benefits attaches to the primary employer only.

Company provides at its own expense health insurance benefits, pension benefits, disability benefits, life insurance benefits, paid holidays, monetary team performance awards and paid vacation time, among other benefits.  The Union only provides a supplemental life insurance benefit to some of the stewards.  (SOF, ¶¶ 6, 8, 9, 18).

### C.    Illinois Bell misapprehends Joint Employer liability under the FMLA

Illinois Bell contends that it cannot be a joint employer with Local 21 of the plaintiff stewards, but it misapprehends the nature of joint employment under the FMLA.  It mistakenly applies an analysis under a different federal statute that joint employment requires two entities to co-determine control over the worker.  But the FMLA's joint employment regulation is nowhere near so narrow.  The regulation generally establishes a joint employment relationship for separate and distinct entities that operate independently where a worker's efforts either benefit both entities or the entities agree to share the employee's services.

Illinois Bell contends that no joint employment relationship can exist unless Illinois Bell and Local 21 "jointly control" the employees' working conditions (Def. Brf. at 15).  Its cited decisions apply joint employer analysis under the National Labor Relations Act, 29 U.S.C. §158(a) ("NLRA"), which is applicable in collective bargaining contexts but different from the standard under the FMLA and FLSA, which confer individual rights.  Under the NLRA, joint employer relationships are found where, despite an absence of common ownership, one entity effectively and actively participates in the control of labor relations and working conditions of employees of the second entity.  *The Developing Labor Law* 2248 (Higgins et al. eds., 5th ed. 2006); *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (7th Cir. 1988) ("Whether two entities are joint employers depends on whether the employer claimed to be a joint employer, possessed

sufficient control over the work of the employees to qualify as a joint employer with the actual employer."(internal citations omitted)).  Most of defendant's citations are to decisions relying on NLRA analysis. *See NLRB v. Western Temporary Services, Inc*., 821 F.2d 1258 (7th Cir. 1987). Defendant cites *EEOC v Foster Wheeler Constructors, Inc*., No. 98 C 1601, 1999 U.S. Dist. LEXIS 10610,(N.D. Ill. July 6, 1999), which nominally arose under Title VII of the Civil Rights Act, but rested upon an analysis of NLRA joint employer analysis.  Therein, the EEOC made the anomalous argument that, since the employer's superintendent was also the union steward, the union through the superintendent "controlled the hiring, promotion, demotion and layoff of pipefitters...and also controlled the assignment of work. [citing NLRA caselaw.]" *Id*. at *27.  But plaintiffs need not show that the Union co-determines Illinois Bell's own working conditions, or vice versa. Were the FMLA intended to be limited to situations where two distinct employers exercise simultaneous control over the employee, the regulation would have no reason to reference working for separate employers at different times, or the sharing and interchanging of employees.

The outcome here would not, in any event, be different even if this Court applied the Company's version of a joint employer test.  Illinois Bell would be found a joint employer by virtue of the facts that it exercises a degree of control over the hiring and firing of Union stewards and it controls the stewards' working conditions through application of its disciplinary Code of Conduct and attendance policies even while stewards are performing both MXUP and MXUU Union business activities.  (SOF, ¶¶ 17, 19, 20).

II.     **ALL OF THE PLAINTIFFS' TIME SPENT IN LABOR CONTRACT
        ENFORCEMENT COUNTS AS HOURS OF SERVICE TO ILLINOIS BELL
        FOR DETERMINING FMLA ELIGIBILITY**.

      **A.     FLSA Regulations applicable to the FMLA show that stewards' hours are
        "hours worked" for Illinois Bell**

Plaintiffs are entitled to partial summary judgment for the separate and independent

reason that, even without viewing Local 21 and Illinois Bell as joint employers, all of plaintiffs'

time spent in grievance adjustment (both MXUP and MXUU time) are "hours of service" to

Illinois Bell and are credited toward FMLA eligibility.  Illinois Bell concedes that stewards'

contract enforcement activity in meetings with management, coded MXUP, is credited toward

FMLA eligibility.  MXUU hours, which are virtually all spent in contract enforcement activity

outside meetings with management (SOF ¶ 11, 12), should also be credited as hours of service

toward FMLA eligibility.

To be eligible for FMLA leave, employees must accrue 1,250 "hours of service" in the

12-month period prior to their leave request.  The term "hours of service" is not defined by the

FMLA.  Instead, DOL regulations state that the FMLA hours of service requirement is

determined according to the principles established under the FLSA for determining compensable

"hours of work." 29 C.F.R. § 825.110(c) (*see generally* 29 C.F.R. Part 785).  Thus, if the

plaintiffs' MXUU-coded hours are deemed "hours worked" under the FLSA, they are also

considered "hours of service" under the FMLA.  *See also* 29 U.S.C. § 2611(2)(C).

FLSA regulations directly address time spent in collective bargaining agreement

enforcement.  The relevant regulation provides:

> Time spent in adjusting grievances between an employer and employees during
> the time the employees are required to be on the premises is hours worked, but
> in the event a bona fide union is involved the counting of such time will, as a

> matter of enforcement policy, be left to the process of collective bargaining or to
> the custom or practice under the collective bargaining agreement.

29 C.F.R. § 785.42.

Without any authority, Illinois Bell argues that the regulation should be interpreted narrowly. (Def. Brf. at 4). But it overlooks that Congress, when enacting the FMLA, intended that when determining employees' FMLA eligibility, the "hours of service" concept should be construed broadly in favor of coverage. See H.R. Rep. No. 103-8(I) 103rd Cong., 1st Sess. at 254, 1993 WL 30779 (Feb. 2, 1993) ("The minimum hours of service requirement is meant to be construed broadly...."). See also Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, FMLA-46, 1994 DOL FMLA LEXIS 23 (October 14, 1994) ("The report of the Senate Committee states, among other things, that the minimum hours of service requirement is meant to be construed broadly...."). Further, as explained below, the DOL interprets this FLSA regulation broadly.

The FLSA regulation establishes that "time spent in adjusting grievances" during work hours is compensable work. Where the employees are represented by a union, the regulation incorporates standards under the collective bargaining agreement or the practices developed under the agreement.[9] Under each of the three standards -- the regulation's plain language, the

---

[9] The FMLA borrows "principles" from FLSA Section 7 to determine whether time is counted toward "hours of service," 29 C.F.R. § 825.110(c), but does not borrow non-judicial arbitration mechanisms recognized in certain unique circumstances under the FLSA. Employees may vindicate their FMLA rights before a court rather than a forum decreed by a collective bargaining agreement. *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 363 (7th Cir. 1997); *Bonilla v. Small Assemblies Co.*, No. 99 C 6675, 2001 U.S. Dist. LEXIS 7342, at *6-16 (N.D. Ill. May 30, 2001); *Smith v. CPC Foodservice*, No. 96 C 7394, 1997 U.S. Dist. LEXIS 9041, at *2 (N.D. Ill. June 20, 1997). In two "special cases" arising under the FLSA, the Seventh Circuit ruled that union-represented employees were compelled to arbitrate FLSA claims under the grievance and arbitration provisions of their labor contracts. In both cases, plaintiffs brought collective actions for groups that were "hopelessly heterogeneous" by including persons in dissimilar circumstances, and in both cases the governing labor contract clauses were "materially identical

parties' CBA, and the parties' customs and practices -- the plaintiff stewards' MXUU time should be credited as hours worked for FLSA purposes, and derivatively for FMLA purposes.

The phrase "time spent in adjusting grievances" is not defined elsewhere in Part 785 and no reported FLSA cases have defined the parameters of that phrase with respect to contract enforcement. But DOL has issued opinions reflecting what work should be included as "time spent in adjusting grievances," which the Company has ignored. DOL's opinion letters show that DOL interprets the term "time spent in adjusting grievances" broadly to encompass all of the labor-management activities associated with processing grievances, even where those activities are paid by the union.

Before Regulation 785.42 was promulgated in 1961, DOL was squarely on record that a discussion of grievances between and employee and union representative, outside the presence of a company representative, was compensable as hours worked. When asked whether "time spent by an employee in discussing his grievances with a foreman and with his departmental steward" should be considered time worked for FLSA purposes, DOL replied:

> It is the position of the Divisions that time voluntarily spent in grievance conferences during regular working hours pursuant to the established grievance machinery in the plant is considered to be hours worked under the Act irrespective of whether the conference is held with a company representative or with a union representative.

1949 Wage & Hour Manual (BNA) at 45:291 (Dept. of Labor, April, 1946), attached as Exhibit A.

---

to the statutory standard." *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008); *Leahy v. City of Chicago*, 96 F.3d 228 (7th Cir. 1996). Here, claims are brought by individual plaintiffs, all of whom are stewards who lost FMLA rights solely due to Illinois Bell's decision to disregard MXUU time. Further, and critically, the labor contract here contains no provision for the 12 weeks of leave provided under the FMLA. These rights are derived solely from the statute. Local 21 initially grieved the Company's change in FMLA eligibility. The Company asserted in correspondence to the Union that the CBA contained no entitlement to FMLA rights. (SOF, ¶ 30, 31).

16

DOL's subsequent opinions interpreting its regulation also take a broad view. As to the scope of the term "adjusting grievances," DOL has ruled that the term encompasses all manner of addressing problems at the workplace. DOL includes, as "hours worked" under the Regulation, all time during regular work hours spent at labor-management meetings

> where the purpose of the meetings is for such things as the settlement of grievances, the settling of disputes as to the interpretation of an existing collective bargaining agreement, and the handling of various other problems that might affect the harmony of day-to-day operation of the plant or other establishment.

Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, 1965 DOLWH LEXIS 244 (December 28, 1965). Such hours are credited even if they are compensated only by the union. *Id.* Likewise, DOL considers "time spent in union negotiations" as hours worked under the regulation. Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, 1987 DOLWH LEXIS 40 (July 17, 1987). DOL there concluded that labor-management committee meetings dealing with all manner of issues pertaining to the parties' relationship are "hours worked" for the employer because the employee is serving the "employer's interest in continuous harmonious operation of the business." Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, 1965 DOLWH LEXIS 244 (December 28, 1965).

The employer's interest in resolving disputes is also served outside of labor-management meetings. For example, the stewards field questions from Union members as to a variety of grievances. Not all such grievances reflect contract violations by the employer. The stewards evaluate these grievances and explain their findings to the Union members. The stewards also investigate Company contentions and make decisions outside of management meetings affecting

whether grievances will advance to arbitration. (SOF, ¶ 11).  Hours spent on these activities likewise serve the Company's interest in resolving disputes and harmonious operation of its business.  Consistent with its prior interpretation, DOL recognizes this reality of the workplace and has stated that "time spent in *processing* grievances," may also be hours worked.  Opinion Letter of Wage and Hour Division, U.S. Dept. of Labor, 1965 DOLWH LEXIS 91 (May 18, 1965) (emphasis supplied).  In contrast, time spent "solely with internal union affairs" is outside the scope of the regulation and not considered as hours worked for the employer.  *Id.*

That MXUU time should be credited as "hours worked" under the FLSA, and derivatively as "hours of service" under the FMLA, is further shown through the parties' labor contract and their practices.

The FLSA requires, among other things, that employees working more than 40 hours weekly are paid one and one-half times their regular rate of pay for all hours worked over 40 in a week. [10]  The parties' labor contract requires that all MXUU hours are credited toward the overtime wage rate of one and one-half the regular hourly rate for hours worked in excess of 40 in a workweek. (SOF, ¶ 9). The labor contract thus plainly and definitively establishes that the MXUU hours satisfy the definition of "hours worked" under FLSA regulation 29 C.F.R. § 785.42, and which are therefore recognized as "hours of service" under the FMLA.

The labor contract is explicit in recognizing all hours spent on contract enforcement – both MXUP and MXUU time – as hours worked for purposes of earning overtime with Illinois

---

[10] 29 U.S.C. § 207 states, in relevant part:

[N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Bell.     The conclusion is therefore inescapable that Illinois Bell and the Union agreed these

hours are to be credited as hours worked for the Company for purposes of earning overtime for

all hours worked above 40 in a workweek.   By definition, these MXUP and MXUU hours are

worked only during regular work hours and are not compensable as overtime themselves.   But

they are indeed counted toward every hour worked in excess of 40 in a week. (SOF, ¶¶ 6, 9).

     The Company and Union have also maintained a longstanding custom and practice as to

crediting both MXUU and MXUP hours for FMLA purposes.   Since at least 1998, and possibly

since 1993 – spanning between 7 and 12 years – the Company observed the unbroken practice of

crediting all MXUU time, which is accrued under CBA provision 11.09, toward FMLA

eligibility.   There is no known instance prior to December 2005 in which the Company denied a

Union steward FMLA leave due to the Company's failing to credit MXUU time toward the

1,250-hour requirement.   (SOF, ¶¶ 23, 24).   *See  Turner v. City of Philadelphia*, 262 F.3d 222,

226 (3rd Cir. 2001)(There is a "well-established principle in labor law that a particular custom or

practice can become an implied term of a labor agreement through a prolonged period of

acquiescence.").   This lawsuit arose because the Company unilaterally terminated its

longstanding practice.   (SOF, ¶ 29).

     The Company has suggested in its Statement of Facts, without expressly arguing in its

brief, that its collective bargaining history with Local 21 demonstrates a mutual intention that

MXUU time *not* be counted for FMLA eligibility.   Its Statement of Facts recites that the

Company expressly negotiated in both 2001 and 2004 with another labor organization in another

state to credit MXUU time for FMLA eligibility, and that it negotiated no such provision with

Local 21.   (Def. SOF, ¶¶ 15-17).   But this record instead proves the opposite to be true – that the

Company gave Local 21 every reason to believe that such provisions were unnecessary in the

Local 21 agreement.   Prior to negotiations for the current 2004-09 labor contract, the Company

credited both  MXUP and MXUU hours for FMLA eligibility.  The Company never stated in its

2004 contract negotiations (nor in any prior contract negotiations) with Local 21 that new

contract language was *necessary* in order to continue crediting the time.  After the current

agreement was concluded in June 2004, the Company thereafter continued to credit MXUU time

toward FMLA eligibility for another full year and did not actually deny FMLA leave to stewards

due to non-crediting MXUU time until December 2005.  At no time, either before or after the

2004 contract negotiations, did the Union request bargaining over this issue.  (SOF, ¶¶ 25, 26,

27, 28, 29).  The Company therefore makes no meaningful argument that the parties somehow

agreed in their course of collective bargaining that MXUU time would not be credited for FMLA

purposes.


###### B.        The Company's cited authorities do not limit the scope of DOL Regulations

Lacking meaningful authorities interpreting and applying the FMLA or the FLSA,

Illinois Bell again argues that this Court should define FMLA terms as similar terms are used in

the National Labor Relations Act.  It argues here that the term "adjusting grievances" should be

understood by reference to the NLRA, which includes a similar form of that term to describe one

of the many powers vested in statutory supervisors.

Illinois Bell offers no authority supporting its argument that courts construing the FMLA

or the FLSA should look to the NLRA for guidance.   But the Company nevertheless

misinterprets the NLRA in suggesting that "adjusting grievances" under the NLRA must be

limited to the act of deciding grievances, and does not include closely related activities such as

receiving grievances, investigating them, and evaluating them. (Def. Brf. at 4).

20

Though the NLRA contains two references to adjustment of grievances, Illinois Bell focuses only on one, the definition of a supervisor under Section 2(11) of the Act, while ignoring the latter reference.

The NLRA was promulgated to provide employees the right to organize and choose unions as their bargaining representatives, or to refrain from such activities. Supervisors are agents of the employer, are excluded from the statutory definition of employees, and are therefore denied the collective bargaining rights afforded to employees. Each of the 11 enumerated duties that confer supervisory status on an individual, including the authority to "adjust grievances," vests that individual with the power to act as the employer's agent in controlling an aspect of employee working conditions, including the authority to "adjust grievances" on the employer's behalf. The critical feature here is authority to resolve complaints on the employer's behalf, an act that may take only a few moments. Accordingly, the decisions interpreting Section 2(11) focus on the kernel of this authority, rather than on the investigation and evaluation of grievances, which are obvious predicate acts to exercising this authority. Illinois Bell's cited decisions arise where the NLRB determines if individuals are statutory supervisors (i.e., employer agents) and therefore excluded from the workforce eligible for union representation (Def. Brf. at 4-5).[11]

But the NLRA contains another reference to adjusting grievances that is more relevant to this inquiry. NLRA Section 8(b)(1)(B) prohibits unions from interfering with an employer "in the selection of his representatives for the purposes of collective bargaining or the adjustment of

---

[11] But the NLRB's view of Section 2(11) is not universally accepted. In *NLRB v. Brown & Sharpe Mfg. Co.*, 169 F.2d 331, 334 (1st Cir. 1948), the First Circuit reversed an NLRB determination of supervisory status under Section 2(11), finding that the statutory reference to adjusting grievances includes "the use of independent judgment in collecting, analyzing, evaluating and considering pertinent data for the purpose of determining the validity of the grievance."

grievances."  29 U.S.C. §158(b)(1)(B).  This provision typically arises where a union disciplines

or threatens to discipline a union member who is also a supervisor in order to affect the

supervisor's decisions as a grievance adjustor.  In defining the grievance adjustor activities, the

NLRB takes the common-sense view that adjusting grievances necessarily includes the ancillary

activities associated with it such as receiving the complaint and investigating its validity.  See

*Otis Elevator Co.*, 349 NLRB No. 55, Slip Op. at 16 (2007) ( supervisor "was often a grievance

adjuster. . . . [He] was required to listen to the complaint, investigate its validity, review payroll

records, and resolve the dispute, informing the involved employee as necessary."); *IBEW Local*

*1316*, 271 NLRB 338, 340 (1984)(supervisor "had authority to resolve or adjust these

grievances.  Indeed, it is in his capacity to consider and adjust complaints of employees that he

investigated the complaints . . . and reported them to higher management in an effort to have the

complaints remedied."); *Miami Valley Carpenters*, 296 NLRB 492, 495 (1989) (two supervisors

"had authority to and did adjust 'grievances' as the Board defines the term.  Thus, both

[supervisors] investigated and caused to be corrected employee complaints...."). In *Sheet Metal*

*Workers*, 298 NLRB 1000 (1990), the Board rejected the view that grievance adjustment activity

was limited to the formal meetings with union business representatives.  Rather, it was sufficient

that the employer invested its agents with the "authority and responsibility to settle jobsite

problems." *Id.*, at 1004.  It further stated:

> As the Supreme Court has observed in another context, "there is unlikely to be a
> bright-line distinction between an incipient grievance, a complaint to an
> employer, and perhaps even an employee's initial refusal to perform a certain job
> that he believes he has no duty to perform." [*NLRB v. City Disposal Systems, 465*
> *U.S. 822, 836 (1984)*.]. . . .  Thus, the view that no real grievance adjustment
> within the meaning of Section 8(b)(1)(B) could occur until a dispute reached the
> level of a formal meeting between an employer representative and the
> Respondent's business agent simply ignores the realities of the workplace.

*Id*. at 1003-04. *See also NLRB v. Int'l. Brhd. Of Electrical Workers*, 481 U.S. 573, 585-86

(1987) (defines § 8(b)(1)(B) activities as including "collective bargaining, grievance adjustment,

or some other closely related activity *(e. g.*, contract interpretation)."). NLRA Section 8(b)(1)(B)

is more relevant to this inquiry than Section 2(11) because the latter is principally concerned

with "authority" to act for the employer ("The term 'supervisor' means any individual having

authority, in the interest of the employer,…to adjust their grievances…"). Section 8(b)(1)(B),

applies only in circumstances whether the supervisor actually engages in grievance adjustment.

*Id*. Thus, there is no persuasive reason to conclude the "time spent in adjusting grievances" is

limited to face-to-face labor/management meetings.

Illinois Bell's attempt to draw support from a hodgepodge of miscellaneous Seventh

Circuit rulings is unavailing, since the rulings shed no visible light on the issue at hand.[12]

Illinois Bell also makes the improbable argument that the plain meaning of Regulation

785.42's reference to "time spent in adjusting grievances between an employer and employees"

limits its application to instances where the supervisor meets face-to-face with union

representatives and cannot include the investigation or other ancillary activity associated with

grievance adjustment (Def. Brf. At 6-7) . But Illinois Bell misreads the regulation. It urges the

strained reading of  the regulation as "time spent . . . between an employer and employees." But

the more logical reading of the regulation is that the reference to "an employer and employees"

refers to the *grievances* between them; that it refers to "time spent in adjusting *grievances*

---

[12] *Johnson v. Bodine Electric*, 142 F.3d 363 (7th Cir. 1998), decided whether a union can compel arbitration over a member's Title VII discrimination claim, but the case does not address grievance adjustment in a relevant manner. *NLRB v. General Steel Erectors*, 933 F.2d 568 (7th Cir. 1991), affirmed that an employer cannot allow its supervisor to participate in collective bargaining matters as the union's own representative, but the case does not define grievance adjustment. *Carpenters v. Lee Lumber*, 2 F.3d 796 (7th Cir. 1993) concerns an arbitrator's authority to adjust a grievance, but does not address whether a steward's grievance adjustment activities are the same as an arbitrator's activities.

between an employer and employees," since the regulation's intent is to address labor-management relations.  Were the regulation intended to support defendant's view, it would likely refer to "time spent in *meetings* adjusting grievances between an employer and employees." The absence of this restriction to meetings further suggests the broader view of grievance adjustment activities.

Illinois Bell argues, finally, that if plaintiffs' activities fall outside the scope of 29 C.F.R. § 785.42, they are subject to the *Tennessee Coal* test that "hours worked" be controlled or required by the employer and pursued primarily for the employer's benefit (Def. Brf. at 7-9). Plaintiffs concede this point, but they disagree that Regulation 785.42 is inapplicable or that defendant's cited decisions support their position.

Defendant cites *Koontz v. USX Corporation*, No. 99-3191, 2001 U.S. Dist. LEXIS 9319 (E.D. Pa. July 2, 2001), presumably for the proposition that plaintiffs' activities fall outside the scope of Regulation 785.42.  *Koontz* concerned in part an employee whose "union business hours" were not credited under FLSA Regulation 785.42.  The decision is of little use to resolving this case because the *Koontz* court did not address whether or to what extent the "union business hours" were spent in grievance adjustment or some unrelated union activities, such as wholly internal union matters.  Further, the court did not address whether or why regulation 785.42 failed to apply.  Here, more than 95% of MXUU hours are spent in grievance adjustment. The court's only finding of relevance here was that the employer "neither tracked nor compensated" the hours spent on union business.  *Id*. at *29.  But here, Illinois Bell tracks all Union business hours, both MXUP and MXUU, with the same specificity, and it credits all such hours for purposes of overtime compensation and for fringe benefits.  (SOF, ¶¶ 6, 9-12).

Defendant's only other citation is to *Local 1065, Amalgamated Transit Union  v. Central*

24

*Contra Costa County Transit Authority*, 73 F. Supp. 2d 1117 (N.D. Cal. 1999), which concerned a claim by striking employees whose contract had expired that their unpaid hours spent negotiating a new labor contract should be paid under the FLSA.  The parties' contract and/or practice was to compensate contract negotiation hours before the contract expired but not after expiration. *Id.* at 1119-20.  The Court there concluded that the post-expiration contract negotiations were "not sufficiently analogous to the adjustment of grievances" to be covered under Regulation 785.42, and therefore applied the *Tennessee Coal* test.  *Id.* at 1122.  Since this matter does not concern contract negotiation, but rather contract enforcement, the *Local 1065* decision does not touch on the relevant issues here, except for its acknowledgment that Regulation 785.42 extends to activities that are "analogous" to the adjustment of grievances. *Local 1065* therefore suggests that even activities that are *related to* grievance adjustment are covered under the regulation.


## CONCLUSION

Wherefore,  for each of the foregoing reasons, individually and collectively, plaintiffs request that their motion by granted and this court enter partial summary judgment in plaintiffs' favor.

Respectfully submitted,


_____/s/  Robert E. Bloch_____
One of the attorneys for plaintiffs

Robert E. Bloch
Justin J. Lannoye
DOWD, BLOCH & BENNETT
8 S. Michigan Avenue, 19th floor
Chicago, IL   60603
rebloch@dbb-law.com
jlannoye@dbb-law.com