**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DEBORAH MAPLES, DONNA STONER,** ) | |
| **GRACE RIVERA,** ) | |
| **LOUELLA BYRNES, MICHAEL O'CONNOR,** ) | |
| **and LOCAL UNION No. 21 OF THE** ) | **No. 07 C 6725** |
| **INTERNATIONAL BROTHERHOOD OF** ) | |
| **ELECTRICAL WORKERS, AFL-CIO** ) | |
| ) | **Judge Castillo** |
| **Plaintiffs,** ) | **Magistrate Judge Nolan** |
| ) | |
| **v.** ) | |
| ) | |
| **ILLINOIS BELL TELEPHONE** ) | |
| **COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF KEVIN CURRAN

Kevin Curran, having been duly sworn, on oath deposes and states that if he were called to testify in the above-captioned matter, he would be competent to testify to the following facts based upon his personal knowledge, and that these facts are true and correct:

1.     I have been employed by Illinois Bell Telephone Company (the "Company") since 1987 as a Collections Service Representative.

2.     In 1994, I was hired by International Brotherhood of Electrical Workers Local 188 ("Local 188") to serve as a steward at the South Side of Chicago office at 6250 Claremont. I was promoted to Area Representative in 1996 for the South Side of Chicago. In 1997, I was appointed as Assistant Business Manager of Local 188. After the merger of Local 188 into the International Brotherhood of Electrical Workers Local 21 (the "Union" or "Local 21"), I became a Business Representative for the Union. In 2005, I was appointed to my current positions as the



EXHIBIT
A

Vice President and Assistant Business Manager of the Union. (In 2006, I was elected by the Union membership as Vice President.)

3.    As Vice President and Assistant Business, I am responsible for supervising the Union's business representatives, chief stewards, area stewards, and stewards who work for the Company (the "Stewards"). I have personal knowledge of the work and working conditions of the Stewards since 1994 either as a supervisor of Stewards (1998 to present) or from working as a Steward and Business Representative (1994 to 1998).

4.    The Union is an unincorporated association with a place of business in Downers Grove, Illinois, where it is engaged in the business of representing employees in bargaining with employers, including the Company, with respect to wages, hours, and other terms and conditions of employment.

5.    The Union is affiliated with the International Brotherhood of Electrical Workers (the "International"), which is located in Washington, D.C. The Union remits in excess of $1 million in dues and other assessments to the International annually.

6.    The Union and Company have entered into collective bargaining agreements the most recent of which is effective June 27, 2004 through June 27, 2009 (the "CBA"). The Company and Union (or the Union's predecessor unions) have maintained a collective bargaining relationship since at least 1947.

7.    The Plaintiffs are stewards who are employees of the Union. They are paid a salary equal to 1% of their monthly Company pay (except for Donna Stoner who is an Area Steward, and Deb Maples and Mike O'Connor are Chief Stewards). In addition, the Union reimburses the Stewards for the time that they are not paid by the Company. To be hired as a Steward, an individual must be a current employee of the Company.

8.    The Stewards are also employees of the Company. They are paid by the Company for the time spent performing their regular Company work duties. They are also paid for the time spent as Stewards meeting with Company representatives pursuant to sections 11.06 and 11.08 of the CBA. The Stewards report such time to the Company as Miscellaneous Absence Union Paid, or "MXUP."

9.    The time reported as MXUP includes attendance at the following informal and formal meetings: (1) grievance meetings with management; (2) Union-Management Review Board; (3) Full Committee; (4) CBA implementation; and (5) contract negotiations.

10.    Time spent by Stewards in activities falling within sections 11.09 through 11.12 are compensated by the Union and reported to the Company as Miscellaneous Absence Union Unpaid, or "MXUU." Since at least December 2004, Plaintiffs have spent over 95% of their MXUU hours performing collective bargaining agreement enforcement. These activities include the following: (1) meeting with members to determine if their complaints concern Company actions that violate the CBA; (2) preparation and filing of grievances; (3) investigating grievances; (4) interviewing witness concerning potential or actual grievances, (5) processing grievance paperwork, (6) obtaining information from company relevant to grievances, (7) conferring with other stewards and union officers concerning grievances and arbitrations, including whether to pursue such avenues, (8) preparing for arbitration of grievances, (9) attending and participating in grievance arbitration proceedings, and (10) conferring with or drafting letters to members concerning the results of their grievances.

11.    Less than 5% of the Plaintiffs' time is involved with attending conferences, steward training and other internal union business not involving the administration of the CBA.

12.    Stewards' workweeks are divided between, MXUU time, MXUP time and, in

some cases, the Stewards' regular work duties for the Company. Stewards' workweek is 40 hours.

13.      The Stewards only report the number of MXUU and MXUP hours to the Company. They do not report to the Company what they are doing during those hours. The Stewards do not report subcodes (or "reason codes") for MXUP time to the Company. The Company has never informed the Union that the Stewards are required to use subcodes when reporting MXUP time.

14.      Union employees, including Stewards, report problems with management to me. If problems with management are reported to other Union officers, I become aware of such problems through discussions and correspondence with other Union officers. I am not aware of any cases prior to December 2005 in which a Union employee was denied FMLA leave for failing to meet the 1,250-hour requirement or any cases in which a Union employee was disciplined for taking leave without satisfying the 1,250-hour requirement.

15.      During the 12-month periods prior to the dates on which the Plaintiffs requested FMLA leave from the Company, the Plaintiffs' MXUU time when counted alone did not exceed 1,250 hours. During those same periods, the aggregate of Plaintiffs' MXUP time and their regular work hours did not exceed 1,250 hours.   During those same periods, the aggregate of each Plaintiff's MXUU time spent on contract enforcement,  MXUP time, and regular work hours exceeded 1,250 hours.

16.      A true and correct copy of the relevant CBA provisions are attached hereto as Exhibit A.

17.      The arrangement to share the services of the Stewards' has been in place at least since 1994. The provisions set forth in the current CBA as sections 11.06 through 11.12 have

been in past CBAs since 1995.

18.    When performing their regular duties for the Company, the stewards are under the supervision, direction and control of the Company. When performing MXUU and MXUP time, Stewards are subject to both Local 21's work rules and Illinois Bell's work rules, including the Company's Code of Conduct and the Company's policy with respect to attendance.

19.    The Union has the power to fire the Stewards. If the Company fires employees who serve as Stewards, they can no longer remain employed as Union Stewards.

20.    Employees must be employed by the Company in order for the Union to hire them as Stewards. The Union cannot appoint and place individuals from outside the Company's workforce as Company stewards. When employees become stewards, they become stewards in their existing department. The Union cannot re-assign the stewards to work in different departments. The Company, however, may transfer and assign employees to different work location over the objection of the employee and the Union. The only limit to the Company's power with respect to transferring or assigning the work location of the Stewards is that such transfer does not affect the Stewards' status as a representative of the Union pursuant to CBA Section 11.01. If the Company does not transfer a Steward to a different department, the Union would not be able to retain the Steward because that Steward could not serve the employees of the prior department, unless there was opening for the Steward in the new department.

21.    I participated in the negotiations for the CBA in 2004. The issue of counting MXUU time toward FMLA eligibility did not arise. The Union was not aware of the Communications Workers of America's agreement with the Company with respect to counting MXUU time toward FMLA eligibility until October, 2005. Discussions with the Company about this issue did not arise until October 2005 when Linda Cox became aware that the Company may

not count such time. The Union did not receive notice in July 2005 that the Company stopped counting MXUU time toward FMLA leave for the stewards. At no time did the Union request bargaining with the Company over this issue. The Union's position has always been that the MXUU time should count toward FMLA eligibility.

22.    When the Union became aware that the Company stopped crediting MXUU time toward FMLA eligibility in October 2005, the Union did not request bargaining over the matter or a modification of the current CBA. The Union asserted that its stewards were already entitled to crediting MXUU time toward FMLA eligibility.

23.    The FMLA is not referenced in the CBA nor does the CBA confer any rights to leave that are substantially similar to those set forth in the FMLA

24.    The Union filed grievances on behalf of Louella Byrnes and Donna Stoner for the Company's denial of their FMLA leaves. The Company refused to arbitrate those grievances because no provision of the CBA addressed those grievances. (Letter from Janice T. Piehl, Sr. Manager-Labor Relations of the Company to Union business representatives Vickie Burroughs and Kurt Schmidt (attached as Exhibit B).

25.    Between 1993 and 1998, there are no instances reported to the Union where the Company failed to credit steward hours spent on duties currently coded MXUU toward FMLA eligibility.

26.    Between 1998 and December 2005, the Company credited steward hours spent on duties currently coded MXUU toward FMLA eligibility. If the Company had failed to credit MXUU hours for FMLA eligibility, most or all stewards would have been denied FMLA leave during this period.

I declare under penalty of perjury that the foregoing is true and correct.

s/ Kevin Curran

Kevin Curran

Executed on June 30, 2008.



AGREEMENT BETWEEN

**SBC**

SBC MIDWEST

AND

INTERNATIONAL
BROTHERHOOD OF
ELECTRICAL WORKERS
LOCAL UNION 21

**Effective June 27, 2004 through June 27, 2009**

278



EXHIBIT
KEVIN A CURRAN

## ARTICLE 11

## UNION OFFICERS AND REPRESENTATIVES

**Promotions & Transfers Of Union Representatives**

11.01  The Company agrees that it will not promote or transfer any Local Union officer, Chief Steward/Area Steward, Business Representative/ Assistant Business Manager, or Steward, or other equivalent titles of the Union (even though the previously mentioned Union representative is agreeable thereto) which affects the employee's existing status as a duly certified local Union representative of the Union, without first obtaining the consent of the Union. The Company shall give the Union written notice of the proposed promotion or transfer and the Union shall conclusively be presumed to have consented unless, within one (1) week after receipt of such written notification, it advises the Company in writing that it does not consent. The Union shall keep the Company advised in writing of the names of all representatives coming within the scope of this Section at the proper Union-Management level.

11.02  The above also applies to temporary changes to Report Location of the above mentioned Union representatives which are for a period in excess of thirty (30) days.

**Stewards & Orientation**

11.03  The Company will recognize Stewards selected in accordance with the Union rules and regulations as the Union representatives of the employees in the respective groups for which they are chosen. The Company also recognizes that the displacing of a Steward is the function of the Union. The Union will notify the Company of the identity of Stewards and, within five (5) working days, of any change in Stewards' status. When practical, Stewards shall not leave their work without notifying their supervisors.

11.04  Each newly hired employee will be introduced by a supervisor to the appropriate Local Union representative and the Local Union representative will have up to thirty (30) minutes to confer with the employee. Time spent in such meetings during the employee's regularly scheduled hours shall be paid.

11.05  Each transferee will be introduced by their supervisor to the appropriate Local Union representative, however, no additional meeting time will be allowed.

37

**Payment For Joint Meeting Time**

11.06   For purposes of processing grievances, the Company agrees to per-
mit authorized Union representatives to confer with representatives
of the Company without loss of pay during such employees' regularly
scheduled working hours.  In addition, such employees shall suffer
no loss in pay for reasonable time spent during such regularly sched-
uled working hours in traveling for grievance meetings.

11.07   When the Company agrees to meet with a Union representative for
purposes other than the processing of grievances and further agrees
to pay for the time of the Union representative involved, such time
shall be paid in accordance with the terms of this Agreement.

11.08   Employees who are excused in accordance with the provisions of this
Section and Article 9 (Collective Bargaining Procedures), shall give
his/her immediate supervisor reasonable notice of the intended ab-
sence and of the probable duration of the absence.

**Absence For Union Business**

11.09   The Company, insofar as work schedules permit, agrees to grant to
any employee who is an Officer or properly designated representa-
tive of the Union the necessary time off without pay to transact busi-
ness of the Union, provided that the Company is given reasonable
advance notice of such absence.

11.10   It is understood that all absences mentioned in this Section pertain to
the administration of this Collective Bargaining Agreement unless
mutually agreed upon between the Local Union Business Manager
and the appropriate  Director - Labor Relations.

11.11   Excused absences for Union business include absences by Union
officers or properly designated representatives of the Union to per-
form administrative duties concerning their Locals.  In addition, such
duties are understood to include attendance at conventions and train-
ing classes associated with those administrative duties, and Telephone
Coordination Council meetings, by those officials or by their desig-
nated representatives.

11.12   Such excused absences do not include absences in connection with
organizing activities with other employees, grievance and arbitration
proceedings with other employers, or other activities related to the ad-
ministration of collective bargaining agreements with other employers.

38

**Leave Of Absence For Union Business**

11.13  Excused absences granted to a Union representative shall not exceed thirty (30) consecutive calendar days or a total of three hundred sixty (360) cumulative scheduled hours in any calendar quarter. Absences in excess of this amount shall not be authorized except by a leave of absence to be applied for by the Union in writing.

11.14  Requests for leaves of absence for Union business shall be made as far in advance as possible. Such requests shall be submitted to the appropriate Director - Labor Relations to arrange for approval and such requests shall be granted provided that all eligibility requirements are met. The initial period of such a leave of absence shall not exceed one (1) year, however, at the request of the Union and following similar procedures, it may be renewed on an annual basis. The total combined period of all such leaves of absence will not exceed eighteen (18) years.

11.15  The conditions of such leaves of absence for Union business are outlined in a current Memorandum of Agreement between the Parties.

11.16  A Union representative upon return from an excused absence or leave of absence, shall be reinstated to the same job title or a job title of equal pay to that in which the employee was engaged immediately preceding the absence subject to the provisions of this Agreement relating to layoffs. The employee shall be placed on the payroll at the rate then in effect for his/her assignment and for the period of service which was credited for wage purposes at the start of the leave of absence. No physical or other examination shall be required for reinstatement. However, the Company reserves the right to have such person examined to determine fitness for work or job placement if required by the law or if the Company would also subject any other employee returning from an excused absence or leave of absence to the same examination.

16.08  The procedures set forth in this Section shall be the exclusive means by which the Union may contest the schedule of wage rates which the Company sets for any new job title or classification.

16.09  The time limits set forth in this Section may be waived by agreement of the Parties.

**Promotion and Refusal Of**

16.10  When a vacancy occurs in a higher rated job title, employees with the greatest seniority shall be given full consideration before an appointment or transfer is made.  However, seniority shall not be the governing factor and shall not prevent the transfer or appointment of an employee with less seniority, whose ability or qualifications are greater than that of the senior employee under consideration for the work in the higher rated job title.  The Company will weigh very carefully the ability and qualifications of the employees with seniority together with his/her availability as to location before making these appointments.

16.11  Should an employee decline a promotion, such action by the employee shall have no effect on that employee's future promotion.

16.12  Promotional increases shall be granted employees upon transfer to a higher title classification.  Such increases will be granted at the beginning of the biweekly payroll period starting on or after the date of promotion.

## ARTICLE 17
## BENEFITS

17.01  No change shall be made in the terms of the existing:
Ameritech Pension Plan
SBC Flexible Spending Account Plan
SBC Adoption Reimbursement Program
SBC Savings and Security Plan
SBC Rules for Employee Beneficiary Designations
SBC Umbrella Benefit Plan No. 1 comprised of the following programs:
    Ameritech Comprehensive Health Care Plan
    Ameritech Dental Expense Plan
    Ameritech Vision Care Plan
    SBC CarePlus – A Supplemental Medical Plan
    SBC Medical and Group Life Insurance Plan
    Ameritech Sickness and Accident Disability Benefit Plan
    Ameritech Long Term Disability Plan

54

SBC Umbrella Benefit Plan No. 2 comprised of the following programs:
SBC Supplementary Group Life Insurance Program
SBC Dependent Group Life Insurance Program
SBC Group Long-Term Care Insurance Plan
SBC EAP Plan

or their successor Plans and those other Benefits/Welfare related items, which would reduce or diminish the benefits or privileges provided thereunder as they apply to employees represented by the Union without the consent of the Union.

17.02 Unless the Parties mutually agree, there shall be no negotiations concerning changes in the Plans during the period of this Agreement. Such negotiations shall not extend more than thirty (30) days following such mutual agreement.

17.03 Neither the Benefit Plans, their administration nor the terms of a proposed change in the plans are subject to the grievance or arbitration procedures of this Agreement.

17.04 Disputes involving the true intent and meaning of this Article may be submitted to the grievance and arbitration procedures of this Agreement.

17.05 The Company will provide the Union with a copy of the Ameritech Benefit Plans upon execution of this Agreement.

## ARTICLE 18

### SCHEDULING AND PAYMENT FOR TIME WORKED
### FOR EMPLOYEES REPRESENTED BY LOCAL UNION 21
### APPENDIX B EXHIBITS 1, 2 AND 3

### Scheduling

18.01 Definitions

(A) The term shift shall designate the hours constituting a regular day's work, normally eight (8) hours assigned by the Company, except as otherwise provided in this Agreement.

(B) The term tour shall designate collectively the shifts to be worked in a calendar week, assigned by the Company. Normally, a tour consists of five (5) shifts totaling forty (40) hours, except as otherwise provided in this Agreement.

55

been taken.  In the event of such continuous duty, the employee will be permitted reasonable paid time to eat on the job.

18.12   Full-time employees and part-time employees working six (6) continuous hours or more shall be allowed two (2) fifteen (15) minute paid relief breaks per day.  One (1) such relief break shall be allowed before and one (1) after the meal period, at a time designated by the Company.  Part-time employees working three (3) continuous hours or more but less than six (6) hours, shall be allowed one (1) fifteen (15) minute paid relief break per day.

**Overtime & Premium Pay**

18.13   The basic hourly wage rate including applicable differentials shall be paid for all time worked, except where overtime rates or premium rates are specifically provided for elsewhere in this Agreement.

18.14   Employees shall be paid at the overtime rate of one and one-half (1 1/2) times their basic hourly wage rate including applicable differentials for work performed under the following conditions, except as provided in paragraph 18.15 below:

    (A)   Time worked in excess of eight (8) hours in a day; or

    (B)   Time worked in excess of forty (40) hours in a week; or

    (C)   Time worked on a non-scheduled day; or

    (D)   Time worked on a call out.

18.15   Overtime hours worked in excess of nine (9) hours per week shall be paid at the rate of two (2) times the basic hourly wage rate plus applicable differentials, except as otherwise provided herein.

18.16   A premium payment at the rate of one and one-half (1 1/2) times the basic hourly wage rate including applicable differentials shall be paid to employees for hours worked as scheduled Sunday shifts or as otherwise provided in this Agreement.  Premium payments for Holidays will be paid as described in Article 25, Recognized Holidays.

18.17   No combination of overtime, premium and/or any other payments for time worked and/or any payments for time not worked, may produce an effective rate greater than two and one-half (2 1/2) times an employee's basic hourly wage rate including applicable differentials.

60

18.18 For the purpose of crediting time not worked towards an employee's eligibility for overtime payments (as defined in paragraphs 18.14 and 18.15 above) only the following absences during a scheduled shift shall be considered:

- Illness (Paid)
- Death in Family (Paid)
- Jury or Other Court Duty (Paid)
- Severe Weather (if employee reports to work)
- Visit to Medical Facility or Company-Designated Physician at Company's Request
- Travel Time at Company's Request
- Civic Affairs (such as Community Fund, Red Cross, etc.) when Assigned by Company
- Authorized Attendance at Joint Meetings with the Company including Joint Union-Company Committee Meetings, Grievance Meetings and Union-Management Review Board Meetings
- Excused Time for Union Business (Unpaid)
- Vacation Days and Vacation Weeks
- Recognized Holidays
- Excused Work Days (Paid and Unpaid)
- Excused Time Requested by Company
- Collective Bargaining with the Company
- Sickness and Accident Disability (Paid)
- Leave of Absence (Paid)

18.19 The Company will distribute overtime as fairly as is practicable between employees within the work group affected by such overtime.

**Prearranged Overtime**

18.20 When arrangements for overtime work are made in advance of the time work is to begin, pay treatment shall be as follows:

(A) Overtime which is worked immediately before an employee's scheduled shift shall be paid at the overtime rate without pay for travel time.

(B) Overtime which is worked immediately after an employee's scheduled shift shall be paid at the overtime rate without pay for travel time.

(C) Overtime which is worked as an extra shift shall be paid for at the overtime rate without pay for travel time but including shift differential payment if one-half (1/2) or more of the employee's scheduled shifts in that week include such payment.

61

been taken.  In the event of such continuous duty, the employee will be permitted reasonable paid time to eat on the job.

19.10  Full-time employees and part-time employees working six (6) continuous hours or more shall be allowed two (2) fifteen (15) minute paid relief breaks per day.  One (1) such relief break shall be allowed before and one (1) after the meal period, at a time designated by the Company.  Part-time employees working three (3) continuous hours or more but less than six (6) hours, shall be allowed one (1) fifteen (15) minute paid relief break per day.

**Overtime & Premium Pay**

19.11  The basic hourly wage rate including applicable differentials shall be paid for all time worked, except where overtime rates or premium rates are specifically provided for elsewhere in this Agreement.

19.12  Employees shall be paid at the overtime rate of one and one-half (1 1/2) times their basic hourly wage rate including applicable differentials for work performed under the following conditions, except as provided in paragraph 19.13 below:

(A)  Time worked in excess of eight (8) hours in a day; or

(B)  Time worked in excess of forty (40) hours in a week; or

(C)  Time worked on a non-scheduled day; or

(D)  Time worked on a call out.

19.13  Overtime hours worked in excess of nine (9) hours per week shall be paid at the rate of two (2) times the basic hourly wage rate plus applicable differentials, except as otherwise provided herein.

19.14  A premium payment at the rate of one and one-half (1 1/2) times the basic hourly wage rate including applicable differentials shall be paid to employees for hours worked as scheduled Sunday shifts or as otherwise provided in this Agreement.  Premium payments for Holidays will be paid as described in Article 25, Recognized Holidays.

19.15  No combination of overtime, premium and/or any other payments for time worked and/or any payments for time not worked, may produce an effective rate greater than two and one-half (2 1/2) times an employee's basic hourly wage rate including applicable differentials.

65

19.16  For the purpose of crediting time not worked towards an employee's eligibility for overtime payments (as defined in paragraphs 19.12 and 19.13 above) only the following absences during a scheduled shift shall be considered:

- Illness (Paid)
- Death in Family (Paid)
- Jury or Other Court Duty (Paid)
- Severe Weather (if employee reports to work)
- Visit to Medical Facility or Company-Designated Physician at Company's Request
- Travel Time at Company's Request
- Civic Affairs (such as Community Fund, Red Cross, etc.) when Assigned by Company
- Authorized Attendance at Joint Meetings with the Company including Joint Union-Company Committee Meetings, Grievance Meetings and Union-Management Review Board Meetings
- Excused Time for Union Business (Unpaid)
- Vacation Days and Vacation Weeks
- Recognized Holidays
- Excused Work Days (Paid and Unpaid)
- Excused Time Requested by Company
- Collective Bargaining with the Company
- Sickness and Accident Disability (Paid)
- Leave of Absence (Paid)

19.17  The Company will distribute overtime as fairly as is practicable between employees within the work group affected by such overtime.

**Meal Allowance During Overtime**

19.18  When an employee is required to work two and one-half (2 1/2) or more additional hours beyond the employee's scheduled quitting time on a regular shift, works a prearranged twelve (12) hours shift, or works eleven (11) or more consecutive hours including travel time which are paid at the overtime rate, the employee will be provided a meal or a Meal Allowance of Eleven Dollars ($11.00).

**Call Outs**

19.19  When an employee is contacted outside of his/her regularly scheduled shift for immediate reporting, pay will begin with the time called and continue until the employee returns home unless the time worked continues to the completion of the employee's next scheduled shift. Should the assignment continue to the completion of the employee's

66



AT&T Services, Inc.
2000 W. SBC Center Drive, 2H83C
Hoffman Estates, IL  60196

T: 847.248.4465
F: 847.248.6844
E: jp1791@att.com

August 21, 2007

Ms. Vickie Burroughs
Mr. Kurt Schmidt
Business Representatives
IBEW Local 21
1307 W. Butterfield Rd., Suite 422
Downers Grove, Il  60515

VIA U.S. MAIL AND FACSIMILE (630 960-9607)

Regarding grievances:  06-I33217, 07-I40668, I41654 – FMLA

Dear Ms. Burroughs and Mr. Schmidt:

In reviewing the Union's request of May 15, 2007 requesting neutral arbitration of the above grievance , it has come to the Company's attention that one of these grievances – number I40668 Louella Byrnes, Denial of FMLA Rights – is not arbitrable.  Article 13.16 of the Collective Bargaining Agreement provides for arbitration of disputes concerning the interpretation or application of the terms and provisions of the Agreement, and nothing in the agreement addresses the subject of this grievance.  Accordingly, the Company will not strike arbitrators for this matter unless and until a court rules that the matter is subject to arbitration under our collective bargaining agreement.

Also, while investigating the Louella Byrnes case, the Company became aware that another matter for which an arbitrator was selected – grievance numbers I33217 and I41654, Donna Stoner, Final Written Warning/FMLA are also not arbitrable for the same reasons.  Accordingly, the Company will not schedule the Stoner grievances for arbitration unless and until a court rules that the matter is subject to arbitration under our collective bargaining agreement.

I apologize if the Company's prior position caused any confusion.  Please contact me with any questions.

Sincerely,

Janice T. Piehl
Sr. Manager- Labor Relations

EXHIBIT
B
KEVIN CURRAN

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   DEBORAH MAPLES, DONNA STONER,       )
    LAVONNE PURKEY, GRACE RIVIERA,      )
4   LOUELLA BYRNES, MICHAEL O'CONNOR,)
    and LOCAL UNION No. 21 OF THE       )
5   INTERNATIONAL BROTHERHOOD OF        )
    ELECTRICAL WORKERS, AFL-CIO,        )
6                                       )
             Plaintiffs,                )
7                                       )
          vs.                           )
8                                       ) No. 07 C 6725
    ILLINOIS BELL TELEPHONE COMPANY,  )
9                                       )
             Defendant.                 )
10

11

12          The deposition of JANNINE KING, taken

13   in the above-entitled cause before Teresa

14   Volpentesta, a notary public within and for the

15   County of Cook and State of Illinois, taken

16   pursuant to the Federal Rules of Civil Procedure

17   for the United States District Courts, at Suite

18   1900, 8 South Michigan Avenue, Chicago,

19   Illinois, on the 5th day of June, A.D. 2008, at

20   1:05 o'clock p.m.

21

22

23

24

*Original*

EXHIBIT
B

1    A.    Yes, it is.
2    Q.    While we are on that page, let me
3 direct your attention to the top of the page.
4       What do the entries at the top of the
5 page signify?
6    A.    Again, it is referencing specific
7 contracts or groups of employees.  I.B.E.W.
8 Local 21 and SBLD, again, that's I.B.E.W.'s
9 agreement with long distance.
10       I.B.E.W. Appendix B, Exhibits 1
11 through 5 in ILB, which is Illinois Bell; INB,
12 which is Indiana Bell; SBCSI, which is SBC
13 Services, and ASI-AIT, which is Ameritech
14 Services, Inc., which are all legal entities
15 under that collective bargaining agreement.
16    Q.    Go ahead.
17    A.    The non-bargained non-management in
18 Michigan -- MIB, Michigan Bell; WIB, Wisconsin
19 Bell; ILB, Illinois Bell; SBCSI, SBC Services,
20 Inc., and ASI-AIT, those are a group of
21 employees that are non-bargained non-management
22 employees that also fall under these rules.
23       That's a standard heading that they
24 put on the whole time reporting manual.  That

1 doesn't necessarily mean that each code applies
2 to the non-bargained for non-management
3 employees.
4    Q.    You are referring to the entries at
5 the top of each page?
6    A.    Correct.
7    Q.    What's the final entry shown at the
8 top of the page?
9    A.    CWA District 4 in MIB, Michigan Bell;
10 Wisconsin Bell, WIB; OHB, Ohio Bell; INB,
11 Indiana Bell; ILB, Illinois Bell; SBCSI, SBC
12 Services; ASI-AIT, Ameritech Services, Inc., and
13 ADS-AIT, which is Ameritech Publishing Services,
14 I believe.
15    Q.    Does this last entry refer to
16 employees who are represented by the
17 Communication Workers of America covered under
18 separate labor contracts?
19    A.    Correct.
20    Q.    Do you know how long the policies set
21 forth on Page 4696 has been in effect for the
22 Local 21 represented employees?
23    A.    Policy.  What do you mean by
24 policies?

1    Q.    The use of the MXOP designation for
2 the types of time that are described.
3    A.    The MXOP code has been in use since
4 we converted to eLink in December of 2002.
5       Prior to that, it was a different
6 code but the same ruling applied, governed by
7 the collective bargaining agreement.
8    Q.    So the only thing that changed in
9 December of '02 is the letters used to
10 characterize or to name the code?
11    A.    Correct.
12    Q.    Okay.  Turn to the next page, please.
13 That's Page Number 4697.
14       Would you please explain what the
15 MXUP code is used to describe?
16    A.    The MXUP is Miscellaneous Absence -
17 Union - Paid.
18       This code is used when a union
19 officer or elected official is reporting union
20 time paid by the company.
21    Q.    And does this code relate to any
22 provision of the Local 21 labor contract?
23    A.    Yes.  It is listed here on the page.
24 It is in Sections 11.06, 11.07, 12.02, 13.06,

1 13.10 through 13.19 and 31.05.
2    Q.    Those are the contract references
3 shown on the box in the middle of the page?
4    A.    Correct.
5    Q.    Could you explain the notes that
6 appear below the description?
7    A.    Are you referring to down here at the
8 bottom of the page?
9    Q.    No, about a third of the way down the
10 page.
11    A.    Oh, okay.  MXUP can be reported for a
12 full or partial day, not to exceed normal work
13 hours.
14       Obviously, that means if the union
15 rep is meeting with the company, it could be for
16 a full eight-hour day, or it could be a partial
17 day, four hours, six hours, three hours.
18    Q.    Normal work hours would be eight
19 hours a day?
20    A.    Correct.
21    Q.    Go ahead, please.
22    A.    Those are the standard normal work
23 hours.  MXUP counts as work time when
24 calculating overtime pay.

Page 26

1      That would mean that the union rep is
2  not -- this time is not deducted towards their
3  overtime calculation for the week or for the
4  day.
5      Q.    What does that mean?
6      A.    Based on the overtime rules governed
7  by the contract.
8      It means that if I was a union rep
9  and I reported MXUP for four hours and regular
10 time for four hours on one given day, and then I
11 worked two hours of overtime, I would still get
12 paid for those two hours of overtime.  It counts
13 towards the overtime worked in a day.
14     Q.    Okay.  Go on, please.
15     A.    MXUP is a paid absence type.  Kind of
16 self-explanatory.
17     Q.    Not really.
18     A.    It means you get paid for the hours
19 reported for MXUP, your basic hourly wage rate.
20     Q.    Do you mean that the time is paid
21 even though the employee is absent from regular
22 work?
23     A.    Correct.
24     Q.    Okay.  Go ahead, please.

Page 27

1      A.    MXUP is excluded from absence
2  reporting for disciplinary action purposes,
3  meaning, this cannot be used against the
4  employee for discipline for attendance.
5      Q.    Okay.  Go on, please.  The next
6  entry.  Could you read that and explain it?
7      A.    Absence reason code is required.
8  Choose one from the list below.  All reason
9  codes are not valid for all employees.  Refer to
10 the matrix in Section 1.6.3.
11     Q.    Are you familiar with the matrix
12 referred to in Section 1.6.3?
13     A.    I don't have it in front of me, so I
14 don't know what they are referring to, but it is
15 part of the time reporting manual.
16     If you look at the top of this sheet,
17 it says Section 1.6.1.  Up in the upper
18 right-hand corner, so I would assume the matrix
19 is in Section 1.6.3.
20     Q.    Okay.  And go ahead.  What appears
21 below those -- that section you just read?
22     A.    Below this section is reason codes
23 which are numbered, M00037, M0061, 62, 66, 67,
24 68, and WB.

Page 28

1      Q.    All right.  As you understand the
2  meaning of these codes, please tell me what each
3  of them means.
4      A.    Well, the M0037, I believe, is just a
5  generic reason code for anything that doesn't
6  fall under these categories, and the other
7  reason codes.
8      Full committee, 61, is referencing
9  time spent in full committee, which is governed
10 by the collective bargaining agreement in one of
11 these sections, but I am not sure which section
12 it is off the top of my head without the
13 contract in front of me.
14     MR. BLOCH:  Off the record, please.
15     (Discussion had off the record.)
16 BY MR. BLOCH:
17     Q.    Can you identify the provision of the
18 labor contract that refers to the full
19 committee?
20     A.    Full committee is referenced or is in
21 Article 12 titled Full Committee, Page 40 of the
22 collective bargaining agreement.
23     Q.    And you are referring to the
24 collective bargaining agreement between Illinois

Page 29

1  Bell and Local 21?
2      A.    Yes.
3      Q.    Okay.  And what time --
4      MS. LINDNER:  I think just for
5  clarification purposes, because there is also
6  reference in this to I.B.E.W. Local 21 in SBLD,
7  we should refer to it as the core agreement so
8  there is no confusion.
9      I mean, if you see in the time
10 reporting manual, there is also reference to a
11 different agreement.  I think she called this
12 one the core agreement.  You might want to
13 clarify that.
14 BY MR. BLOCH:
15     Q.    All right.  We will refer for our
16 purposes to the agreement in front of you as the
17 core agreement.
18     A.    Okay.
19     Q.    And that's the agreement that's not
20 the SBLD agreement; correct?
21     A.    Correct.
22     Q.    All right.  So you were referring to
23 Article 12, Page 40 of the core agreement?
24     A.    Yes.

Page 34

1     A.    No.
2     Q.    Are there any contract references?
3     A.    Yes.
4     Q.    What are they?
5     A.    Section 1310 through Section 1319.
6     Q.    Okay.  13.10 through 13.19?
7     A.    Correct.
8     Q.    Anything else?
9     A.    No.
10    Q.    Okay.  Code M67, what does that
11 describe?
12    A.    Disciplinary/investigatory meeting,
13 and that's referenced in Section 13.01 of the
14 collective bargaining agreement.
15    Q.    What does the code -- what type of
16 time does the code describe or apply to?
17    A.    That code, we would use that reason
18 code if a union rep was meeting with -- if an
19 employee was called in to discuss discipline or
20 an investigation and they asked for a union
21 representation, then that union rep would use
22 that code for that prior to grievance, if any.
23    Q.    Does that code include the time that
24 the union rep is conferring with the employee?

Page 35

1     A.    Yes, it could.
2     Q.    Anything else covered by that
3 category?
4     A.    No.
5     Q.    Any other contract reference besides
6 13.01?
7     A.    Not that I am aware of.
8     Q.    Okay.  The next entry, M68, what time
9 does that describe?
10    A.    That's another type of generic code,
11 other union/management meeting.
12    Q.    What type of meeting does that refer
13 to?
14    A.    That could be any meeting that
15 doesn't fall under the other four codes that we
16 just referenced.
17          I guess it is kind of like a catchall
18 if the union is meeting with the company that's
19 not addressed in the collective bargaining
20 agreement specifically as far as the type of
21 meeting, then it would be coded under that.
22    Q.    Is there any contract reference that
23 relates to it?
24    A.    I can't specifically say a contract

Page 36

1 reference.
2     Q.    Next code, MWB?
3     A.    I am not -- I can't answer that one,
4 because I am not really sure what that means.
5     Q.    Returning back to the first entry,
6 M37.
7          As best you can describe, what time
8 or activity does that code refer to?
9     MS. LINDNER:  Objection, asked and
10 answered.
11 BY MR. BLOCH:
12    Q.    You could go ahead.  It is for the
13 judge, not for you.
14    A.    I don't have specific contract
15 references that could fall under other, because
16 again, it is a generic code.
17    Q.    Well, as best you understand it, what
18 sorts of time would be recorded or referred to
19 by M37?
20    A.    Any time that the company and the
21 union meet together that's not covered under
22 these other specific reason codes.
23    Q.    What would the difference be between
24 M37 and M68?

Page 37

1     A.    I don't really see a difference.  I
2 think they both could be used for other time.
3     Q.    Is it the company's practice with
4 respect to the Local 21 represented employees
5 that these codes you have just described, M37
6 through M68, must be recorded whenever MXUP time
7 is taken?
8     A.    They don't -- I can't really answer
9 that, because I don't know if -- I don't believe
10 they have to put an absent reason code in.  They
11 can still use the MXUP code.
12    Q.    When you say "they," who are you
13 referring to?
14    A.    An employee, a union represented
15 employee.
16    Q.    That would also mean then that the
17 time reporting employees also are not -- the
18 group time reporter -- withdraw that question.
19          That also means the group time
20 reporters are not required to record those
21 reason codes?
22    A.    Correct.
23    Q.    Okay.
24    A.    Wait, back up.  I wouldn't say they

Page 38

1  are not required to. I would say the
2  requirement is to put in one of the reason
3  codes, but will the code still go through and
4  the employee be paid for the time without the
5  reason code, yes.
6      Q.   All right. So you are saying it is
7  not necessary that the reason code be supplied
8  in order for the employee to be paid for time
9  coded as MXUP?
10     A.   Correct.
11     Q.   Are employees disciplined if they
12  failed to provide the reason code?
13     A.   No.
14     Q.   Does the company track the reason
15  codes?
16     A.   I am not aware of -- I am not aware
17  of any tracking, so I don't know.
18     Q.   To your knowledge, are the reason
19  codes typically supplied by Local 21 members who
20  request MXUP time?
21     MS. LINDNER: Objection, form, lack of
22  foundation.
23     THE WITNESS: I don't know.
24

Page 39

1  BY MR. BLOCH:
2      Q.   Okay. Do you advise employees that
3  they must provide the reason codes?
4      A.   If I was asked.
5      Q.   Do you know if any directive has been
6  issued requiring that employees provide the
7  reason codes?
8      A.   Not that I am aware of.
9      Q.   Do you mean that to your knowledge,
10  no such directive is issued?
11     A.   Correct.
12     Q.   Turn to the next page, please.
13  That's Page 4698, and it describes the MXUU
14  code.
15         Would you explain to us, please, what
16  the MXUU code is used for?
17     A.   Miscellaneous Absence - Union -
18  Unpaid.
19         It means this time is unpaid by the
20  company, and MXUU is reported by a union
21  representative that would be doing union
22  business.
23     Q.   And what activities do you understand
24  to be encompassed by the MXUU code?

Page 40

1      A.   It could be -- my understanding is
2  strictly union business. It does not pertain to
3  the company.
4          It could be administrative for the
5  local. It could be attending meetings primarily
6  for the local. Such as what?
7      Q.   Such as what?
8      A.   I don't know.
9      Q.   Would you explain the entries that
10  appear under the heading notes?
11     A.   MXUU can be reported for full or
12  partial days, meaning that an employee can
13  report regular hours. They can report MXUU for
14  the whole entire eight-hour day, or they could
15  report four hours of regular time and four hours
16  to MXUU or whatever consists of an eight-hour
17  day.
18         MXUU is an unpaid absent type. It
19  means that is unpaid by the company. It is paid
20  by the union.
21         Reporting unpaid time related to
22  union activities may have an annual limit of
23  days. Refer to the appropriate union contract
24  for specific limits.

Page 41

1          That is covered under the collective
2  bargaining agreement. It governs the time off
3  for union unpaid time.
4      Q.   Are you aware whether there any
5  contract limits under the core agreement?
6      A.   Yes.
7      Q.   Where do those limits appear?
8      A.   Section 11.13, Page 39.
9      Q.   Anywhere else?
10     A.   No.
11     Q.   Okay. Go ahead. Continue, please.
12     A.   MXUU is excluded from absence
13  reporting for disciplinary action purposes.
14     Q.   Meaning what?
15     A.   Meaning that an employee cannot be
16  disciplined for being absent under the MXUU
17  code.
18     Q.   Okay. In other words, it is an
19  excused absence?
20     A.   Excused, correct.
21     Q.   Okay. What, if any, contract
22  provision refers to the time that is coded as
23  MXUU?
24     A.   Section 11.09.

11 (Pages 38 to 41)

Page 42

1    Q.    Anything else?
2    A.    Actually, I would say it is
3    Section 11.09 through 11.12, and then -- yeah,
4    that's it.
5    Q.    Any other contract provision?
6    A.    No.
7    MR. BLOCH:  Off the record, please.  I want
8    to take a short break.  We will be right back.
9         (Discussion had off the record.)
10   BY MR. BLOCH:
11   Q.    Are you aware of the practices
12   observed by Local 21 stewards when they report
13   their time as MXUU or MXUP?
14   A.    Can you be more specific?
15   Q.    Do you know how the stewards report
16   their time?
17   A.    No.
18   Q.    Okay.  Do you know whether the
19   stewards report time spent investigating a
20   grievance, whether they report that as MXUU or
21   MXUP?
22   A.    No.
23   Q.    Okay.  Do you have an understanding
24   as to how that time is intended to be recorded?

Page 43

1    A.    I need you to be more specific
2    regarding investigating the grievance.
3    Q.    Conferring with a grievant and
4    speaking to employees about the grievance.
5    A.    If they are during work hours?
6    Q.    Yes, during normal work hours.
7    A.    At their work location?
8    Q.    Yes.
9    A.    I would say it would be recorded as
10   MXUP.
11   MR. BLOCH:  Off the record, please.
12        (Discussion had off the record.)
13   BY MR. BLOCH:
14   Q.    Would it be correct to say that in
15   matters of contract administration conducted
16   during normal work hours, the company applies
17   the MXUP time as limited to meetings between
18   union representatives and company
19   representatives?
20   A.    Yes.
21   Q.    Okay.  And in connection with those
22   same activities, contract administration during
23   normal work hours, if there was no meeting
24   between a union representative and a company

Page 44

1    representative, the time would be recorded as
2    MXUU?
3    A.    I would say yes.
4    Q.    Okay.  Do you play any role in
5    connection with the processing of grievances?
6    A.    No.
7    Q.    Turning back to Page 4696 of
8    Deposition Exhibit 2.
9    A.    Can we go back to your processing the
10   grievances?
11   Q.    Go ahead.
12   A.    What do you mean?  Like what kind of
13   processing the grievances?
14   Q.    I don't recall what you are referring
15   it to.  Go ahead.
16   A.    You just asked me if I played any
17   role in the processing of the grievances.
18   Q.    Oh, yes.
19   A.    So like what do you mean by
20   processing the grievances?
21   Q.    Well, do you have anything to do with
22   grievances at the company?
23   A.    I have to say this is a new
24   assignment, so I haven't done it solely on my

Page 45

1    own.  I just started taking over some case
2    manager work for Rock Island.
3    Q.    When did you begin that?
4    A.    About two months ago, but again, I
5    worked with Jan Peel just accompanying her to
6    eventually take over.
7    Q.    And when did you begin accompanying
8    Ms. Peel?
9    A.    About two months ago.
10   Q.    That's after our lawsuit was filed so
11   not relevant, but thank you for mentioning it.
12        Turning to Page 4697, the MXUP entry.
13   Under the notes, it says MXUP counts as work
14   time when calculating overtime pay.  Do you see
15   that?
16   A.    Yes.
17   Q.    Is that also true with respect to
18   MXUU time?
19   A.    No.
20   Q.    What is the difference?
21   A.    The contract governs the calculation
22   towards overtime, and on -- in Section 18.18,
23   Page 61, the bulleted item lists all items that
24   calculate towards overtime.

12 (Pages 42 to 45)

Page 46

1    Q.   Okay.  And is the MXUP time included
2  on there?
3    A.   Yes.
4    Q.   Okay.  What about the entry that
5  appears, the ninth bullet point?
6    A.   Yeah, it does.  Sorry.  I will make
7  the correction.
8    Q.   So the reference to excused time for
9  union business, that is the time that is coded
10  MXUU?
11    A.   Correct.
12    Q.   With regard to MXUP and MXUU time, if
13  an employee is performing union business outside
14  of normal work hours, am I correct that that
15  time cannot be coded as either MXUP or MXUU?
16    A.   Correct.
17            (Whereupon King Deposition
18            Exhibit No. 3 was marked for
19            identification.)
20  BY MR. BLOCH:
21    Q.   I am showing you what is identified
22  as Section 1.6.3 of the Midwest Time Reporting
23  Manual.
24        Is this the page that is referred to

Page 47

1  in Exhibit 2, Page 4697?
2    A.   Yes.
3    Q.   Okay.  Can you identify the relevant
4  portions of Exhibit 3 with respect to the MXUP
5  time code?
6    A.   The MXUP time code description is in
7  the second column.  It goes to the bottom, and
8  it has MXUP the description, which is union paid
9  and groups -- a groups column that says all.
10    Q.   It says all for most of the time
11  entries?
12    A.   Correct.
13    Q.   What does term "all" mean?
14    A.   All groups.  So all groups meaning
15  the groups listed at the bottom here -- I am
16  sorry.  It says -- there is kind of a footer
17  that says No. 1, CWA District 4 operators;
18  No. 2, CWA District 4 non-operators and
19  non-bargained non-management; No. 3, IBEW,
20  Appendix B, Exhibits 1 through 3 and
21  non-bargained non-management; I.B.E.W. Appendix
22  B, Exhibits 4-5 and non-bargained
23  non-management.  Number 5 is I.B.E.W. Local 21
24  in SBLD.

Page 48

1    Q.   So the entries for the various time
2  codes pertains to the employee groups that are
3  identified as Nos. 1 through 5 at the bottom of
4  the page?
5    A.   That's correct.
6    Q.   Thank you.  Other than the -- other
7  than King Deposition Exhibits 2 and 3, are there
8  any other records that you are aware of that
9  describe the use of time codes MXUP and MXUU?
10    A.   No, I am not.
11    Q.   No, you are not aware of any others?
12    A.   Any other documents, right.
13    Q.   Are there any documents that you
14  refer to when you are fielding questions with
15  respect to MXUP or MXUU time?
16    A.   The only documents I referred to are
17  the time reporting manual and the collective
18  bargaining agreement.
19    Q.   Are you aware that the company at one
20  time counted time that was coded as MXUU towards
21  fulfilling the hours of service requirement for
22  FMLA eligibility?
23    A.   No, I am not.
24    Q.   Are you aware that there was a change

Page 49

1  in the way the company accounted for MXUU time
2  with respect to FMLA eligibility?
3    A.   No, I am not.
4    Q.   Well, you have served in your current
5  capacity since March of 2003?
6    A.   (Indicating.)
7    Q.   As of March of 2003, with respect to
8  I.B.E.W. Local 21 employees, was MXUU time
9  counted towards fulfilling the 1250-hour
10  requirement for FMLA eligibility?
11    A.   Not that I am aware of.
12    Q.   Did you direct anyone at that time
13  that they should not count it?
14    A.   Did I personally?
15    Q.   Yes.
16    A.   No.
17    Q.   Your answer was no?
18    A.   (Indicating.)
19    Q.   You have to say it.
20    A.   No.
21    Q.   Are you aware of the mechanized
22  system?
23    A.   I am.
24    Q.   And what is that?

13 (Pages 46 to 49)