IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEBORAH MAPLES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 07-C-6725 |
| v. | ) |
| | ) |
| | ) Judge Castillo |
| ILLINOIS BELL TELEPHONE | ) Magistrate Judge Nolan |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

---

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## INTRODUCTION

The undisputed material facts, relevant legal authorities, and policy considerations underlying the FMLA's 1,250-hour eligibility requirement all support Illinois Bell's position that the FMLA does not require that time spent by IBEW stewards on certain unpaid union-related activities be counted for purposes of determining the stewards' eligibility for FMLA leave. Accordingly, Illinois Bell's motion for partial summary judgment should be granted, and Plaintiffs' motion should be denied.

## ARGUMENT

I. **NEITHER THE LAW NOR THE NATURE OF THE IBEW'S RELATIONSHIP WITH ILLINOIS BELL SUPPORT THE PLAINTIFFS' JOINT EMPLOYER THEORY.**

Plaintiffs contend that the IBEW and Illinois Bell jointly employ the IBEW stewards, so that all of their time spent on union-related business should be stacked with

all of their time spent on Company-related business for purposes of determining their FMLA eligibility.[1] In making this argument, Plaintiffs cite a lot of cases, but not one of them holds, or even remotely suggests, that an employer and a union are joint employers. That is because the fundamental nature of the relationship between a union and an employer is adversarial. Even in joint meetings for which Illinois Bell pays the stewards and counts their time for FMLA eligibility purposes, the stewards are acting in the Union's interests, and the Company representatives are acting in the Company's interests. While there may be times when the IBEW stewards might help resolve disputes to Illinois Bell's benefit, the stewards' primary role is to advocate for its member-employees when disputes arise with the Company.

Furthermore, if one accepts Plaintiffs' argument that all of the IBEW stewards' MXUU-coded time is spent for the benefit of Illinois Bell, then one must also accept that all stewards' activities are for the mutual benefit of the Union and Illinois Bell. Any such conclusion is wrong. Time stewards spend researching grievances to bring against Illinois Bell, which otherwise would not have been brought, cannot reasonably be said to benefit Illinois Bell. Moreover, time stewards spend performing administrative tasks relating to the operation of the union or receiving training on such matters does not benefit Illinois Bell. Thus, given the nature of stewards' roles, Plaintiffs' argument is contrary to reality and fundamentally flawed.

Plaintiffs contend that the relationship between the IBEW and Illinois Bell fits within the FMLA's joint employer regulation, 29 C.F.R. § 825.106(b), because the two

---

[1] It is curious that the IBEW would wish to be found to be a joint employer with the Company. Such a result would expose the IBEW to liability under other employment laws, such as Title VII of the Civil Rights Act of 1966, which otherwise would not exist. *See EEOC v. Foster Wheeler Constructors, Inc.*, 1999 WL 507191, at *8 (N.D. Ill.) (Coar, J.), which is discussed in Def.'s Mem. at 15.

entities have an "agreement" to share the services of stewards. (Pl.'s Mem. at 4). To the extent any such agreement exists, it must be found in the collective bargaining agreement ("CBA") between the IBEW and Illinois Bell. Nothing in the CBA, however, evidences an agreement to "share services." Rather, the CBA provides that the Company must accept the IBEW's designation of stewards and who the IBEW designates to fill those roles, and the Company must also, with limited exception, provide the stewards time off from their jobs for the Company to conduct union-related business. (Def.'s Facts ¶ 4; Peterson Decl. Ex. 1, Articles 11.08, 11.09). Thus, contrary to Plaintiffs' contention, nothing in the CBA supports the notion that the IBEW and Illinois Bell have a mutual agreement to share the stewards' services. By virtue of the IBEW's representation of Illinois Bell employees, the Company has no choice but to allow stewards to engage in union-related business in lieu of performing Company-related business.

Plaintiffs further contend that Illinois Bell exerts sufficient control over the stewards to create a joint employer relationship, arguing that Illinois Bell controls the stewards' hiring and firing, and working conditions. (Pl.'s Mem. at 7-9). To the contrary, Illinois Bell has no control over who the IBEW selects as its stewards. The CBA provides that the Company "will recognize" the stewards selected by the IBEW. (Peterson Decl. Ex. 1, Article 11.03).[2] Nor does Illinois Bell control stewards' removal. In this regard, the CBA provides that the Company also recognizes that the displacement of a steward is the IBEW's function. (*Id.*). If the Company did not want a particular employee to serve as a steward or did not like the way the steward carried out his or her duties, the Company could not discharge or transfer the employee for that reason. To do

---

[2] That stewards must be selected from among the Illinois Bell employees who are IBEW members, as Plaintiffs emphasize, provides the Company little control over which of such employees ultimately serve as stewards.

3

so would be a blatant violation of the National Labor Relations Act ("NLRA"), which

provides that an employer cannot dictate who the union selects as its representatives, or

restrain their representatives' union-related activities.  29 U.S.C. §§ 158(a)(1) and (2).

Furthermore, Illinois Bell has no control over what stewards do when they are

engaged in the unpaid MXUU-qualifying activities.  Unlike MXUP-qualifying activities,

which involve joint participation by Company representatives, MXUU-qualifying

activities do not involve the Company.  IBEW stewards can perform those duties

wherever necessary – on or off Company premises (e.g., at the IBEW's offices) – and

they have no duty to report to the Company what they do during the unpaid MXUU-

coded time.  Indeed, the reason IBEW stewards are required to report time they spend on

MXUU-qualifying activities during their regular shift is so that the Company knows it

does not need to pay the stewards for that time (i.e., an exception to their regular work

schedule).  Additionally, Illinois Bell has very little control over when stewards request

time off for MXUU-qualifying activities.  The CBA provides that the Company must

give stewards time off for union business, with limited exceptions.  (Def.'s Facts. ¶¶ 3, 5;

Peterson Decl. Ex. 1, Article 11.09).  In short, other than the fact that IBEW stewards

perform some Company-related business and some Union-related business, the

relationship between IBEW and the Company does not have any of the hallmarks of a

joint employment relationship, and thus, does not fall within the FMLA's joint employer

regulation, 29 C.F.R. § 106(a).

The IBEW-Illinois Bell relationship is not comparable to a relationship between a

temporary or leasing agency and an employer to which it supplies employees – the only

example of a joint employment relationship provided in 29 C.F.R. § 825.106(a).  In such

a relationship, there is an explicit agreement to share employees' services and there is a direct, mutual benefit to both entities of doing so. The employer benefits from having the employees perform work for it, and the agency is paid by the employer for the use of the employees. Here, as set forth above, other than possibly a joint meeting that actually results in resolution of a dispute between the Union and the Company (an MXUP-qualifying activity), there is little to no benefit to the Company of time spent by IBEW stewards performing union-related business, as it is time spent away from the Company-related work they were hired to perform.

The only authority that Plaintiffs cite in support of their joint employer argument that even discusses a union-employer relationship is a December 28, 1965 Department of Labor ("DOL") opinion letter. However, the opinion letter has no application to the issue in this case. The letter concerns "time spent in labor-management committee meetings."[3] In this case, it is undisputed that time spent by stewards in meetings with Company representatives (i.e., labor-management meetings) – MXUP-coded time – is counted by Illinois Bell as hours worked and toward the FMLA's 1,250-hour eligibility requirement. Nothing in the letter addresses time spent by stewards on union-related business outside labor-management committee meetings, i.e., the unpaid MXUU-coded time at issue in this case.

Plaintiffs note that in the opinion letter, the DOL cites the FLSA's joint employer regulation, 29 C.F.R. § 791.2. However, the DOL did not address the issue of joint employment in its opinion or explain its reference to the regulation. Indeed, nothing in the opinion suggests, as Plaintiffs contend, that when stewards are engaged in union-

---

[3]  At issue in the opinion letter was whether time spent in labor-management committee meetings, which was paid by the union, counted as hours worked under the FLSA for overtime purposes. 1965 DOLWH LEXIS 244.

related business that does not involve the employer's joint participation and "simultaneously" benefit the employer, the stewards are joint employees of the union and the employer.

For the foregoing reasons, and those set forth in Illinois Bell's opening brief, the Court should reject Plaintiffs' argument that the IBEW and Illinois Bell are joint employers of IBEW stewards.

## II.     PLAINTIFFS' HAVE FAILED TO ESTABLISH THAT MXUU-CODED TIME CONSTITUTES "HOURS WORKED" FOR FMLA ELIGIBILITY PURPOSES.

Because IBEW stewards are not joint employees of the Company and the Union, the time they spend in MXUU-coded activities need not count for FMLA eligibility purposes unless it constitutes hours worked for the Company under the FLSA.  To constitute hours worked, the time must fit within the meaning of 29 C.F.R. § 785.42, or satisfy the *Tennessee* Coal test.  It does neither.

Contending that all of their MXUU-coded time constitutes "time spent in adjusting grievances" within the meaning of 29 C.F.R. § 785.42, Plaintiffs first rely on a 1946 DOL opinion letter (Pl.s' Mem. at 16, Ex. A).  That reliance is misplaced.  First, the opinion does even mention the phrase "grievance adjustment," let alone provide an interpretation of the meaning of the phrase.  Furthermore, the letter does not address time spent by union stewards in grievance adjustment; rather, it addresses time spent by employees discussing their own grievances.  The DOL merely offers the opinion, without any analysis, that time employees voluntarily spent in grievance conferences during their regular work hours is "hours worked" under the FLSA, regardless of whether the conference is held with a company representative, a union representative, or both.  Given

that employees who are not stewards generally spend far less time in grievance meetings, and voluntarily give up work time to do so, whereas stewards must, by virtue of their positions, regularly spend time in grievances conferences, it cannot be reasonably concluded that the DOL's opinion should extend to stewards. In any event, a 1946 opinion, containing no analysis of the issue before the Court, has little, if any, persuasive value. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("interpretations contained in formats such as opinions letters are 'entitled to respect' … but only to the extent that those interpretations have the 'power to persuade'"); *Sehie v. City of Aurora*, 432 F.3d 749, 753 (7th Cir. 2005) (holding that interpretations in opinion letters are not binding because they lack the force of law and do not warrant *Chevron*-style deference).

Plaintiffs go on to argue that subsequent DOL opinions support their broad interpretation of the term "adjusting grievances." (Pl.s' Mem. at 17-18). Again, they are mistaken. As stated above, the December 28, 1965 opinion letter which they again cite addresses only time spent in labor-management meetings, not time spent by union stewards outside of such meetings. As Illinois Bell counts such time (coded MXUP) in determining stewards' FMLA eligibility, the opinion has no bearing on the issue before the Court. Nor does the opinion address the meaning of the terms "adjusting grievances."

Plaintiffs further note that in another opinion letter, the DOL states, again without analysis, that "[i]t is our general position that time spent in union negotiations is hours worked for purposes of FLSA if the time occurs during regular working hours." 1987 DOLWH LEXIS 40 (July 17, 1987). Such time, however, is not at issue in this case. Illinois Bell pays stewards for time spent in negotiations and counts it for determining FMLA eligibility (Def.'s Facts ¶ 9; Peterson Decl. Ex. 1, Article 9.02). This opinion,

then, is not relevant to the issue in this case and does not shed any light on the issue in this case or the interpretation of "adjusting grievances" in 29 C.F.R. § 785.42.

Plaintiffs also cite another 1965 DOL opinion letter, in which the DOL states that if time spent in "processing grievances and in attending meetings of employer and employee representatives for purposes of conducting negotiations ... occurs during regular working hours, it *may* have to be counted as hours worked." 1965 DOLWH LEXIS 91 (May 18, 1965) (emphasis added). The DOL did not address "grievance adjustment" and did not specify the circumstances under which time spent "processing" grievances "may" count. However, the agency went on to state that "time spent by an employee as a union officer in attending a conference solely with internal union affairs would appear to stand on a different footing. As a matter of law, time spent in such an activity is not regarded by the WHPC Divisions as hours worked for the employer for purposes of the Act." This quoted language suggests, if anything, that the DOL would not consider certain time spent internally by union representatives investigating and evaluating possible grievances as hours worked.

Plaintiffs next contend that the parties CBA "plainly and definitively establishes that MXUU hours satisfy the definition of 'hours worked' under FLSA regulation 29 C.F.R. § 785.42, and which are therefore recognized as 'hours of service' under the FMLA." (Pl.s' Mem. at 18). Nothing in the CBA expressly addresses whether MXUU time counts as hours worked under the FLSA or FMLA. If it did, the parties would not be litigating the issue before the Court. In fact, contrary to Plaintiffs' argument, the language of the CBA indicates that the Union and the Company agreed in bargaining that MXUU time is not "hours worked." In providing that the Company will credit certain

time for overtime purposes, including "Excused Time for Union Business (Unpaid)" (i.e.,

MXUU-coded time), the CBA expressly refers to such time as "time not worked." (Pl.s'

Facts ¶ 4; Curran Decl. Ex. A, Articles 18.18 and 19.16).

Furthermore, that the Company counts MXUU hours for overtime and benefits

purposes – which has been negotiated by the IBEW – is not determinative of whether

those hours in fact count as hours worked for purposes of determining FMLA eligibility.

Simply because the Company expressly agreed in bargaining to count MXUU hours for

some purposes, does not mean that the Company implicitly and unilaterally agreed to

count MXUU hours for other purposes. Indeed, the Company has set up a mechanized

process to calculate FMLA eligibility which does not count MXUU hours for Illinois Bell

employees, except for those employees who are represented by the CWA, which

bargained for that different treatment. (Def.'s Facts ¶¶ 16-18).

Plaintiffs last argue that IBEW stewards should receive credit for MXUU time for

FMLA eligibility purposes because the parties have a "longstanding custom and practice

as to crediting both MXUU and MXUP hours for FMLA purposes." (Pl.s' Mem. at 19).

This, too, is contrary to settled labor law and the undisputed facts. For a past practice to

become an implied term of a collective bargaining agreement, it must have been a

longstanding and *recognized* practice. *See Bonnell/Tredegar Indus., Inc. v. N.L.R.B.*, 46

F.3d 339, 344 (4th Cir. 1995); *Arcadia v. Nestle Food Corp.*, 38 F.3d 672, 675 (2nd Cir.

1994) ("[a]s a definitional matter, 'custom' suggests an ongoing *understanding* with

some continuity") (emphasis added); *Kassa v. Kerry, Inc.*, 487 F.Supp.2d 1063, 1075 (D.

Minn. 2007) (noting that "federal authorities consistently require *knowing* acquiescence

before finding a custom or practice under a CBA") (emphasis added).

Here, no custom or practice of crediting MXUU-coded time for FMLA purposes can be found.  It is undisputed that in 2001 collective bargaining negotiations, the CWA and the Company reached an express agreement to count MXUU-coded time for purposes of calculating FMLA eligibility retroactive to calendar year 2000.  (Def.'s Facts ¶ 16).  Thus, from the Company's perspective, as of 2001, only the CWA-represented employees – who negotiated that benefit, and not IBEW-represented employees, who had not – should have been getting credit for MXUU-coded time for FMLA purposes.

Before the Company implemented its mechanized system for calculating FMLA eligibility, such calculations were left to individual departments.  There is no evidence that any Company directive was issued to the local departments as to how to treat MXUU-time in making those calculations consistent with employees' bargained-for rights.  When the mechanized system was set up, the individual responsible for developing it, Joe Atilano, assumed based on information that he had received concerning the CWA's agreement with the Company to count MXUU-coded time for FMLA eligibility purposes, that the IBEW had the same agreement.  Accordingly, when the mechanized system was implemented in May 2003, it initially counted MXUU-coded time for all Illinois Bell employees, including those represented by the CWA and the IBEW.  It was not until November 2005, when Atilano learned that his assumption was incorrect and that the IBEW had not negotiated the same agreement as the CWA, that the mechanized system was reprogrammed to exclude MXUU-coded time in calculating the FMLA eligibility of IBEW-represented employees.  (Atilano Dep. at 8-11, 16-17, 25-28, 31-35 (attached at tab A); Atilano Decl. ¶¶ 6, 7).

Given these undisputed facts, to the extent IBEW-represented employees received credit for MXUU-coded time for FMLA purposes, it was due to happenstance, habit, or inadvertence by local managers before implementation of the mechanized system, and then due to inadvertence by Joe Atilano in setting up the mechanized system. It was not based on a knowing Company decision to count such time (which would have been inconsistent with the Company's seven-year history of bargaining the issue with the CWA). A practice that evolves through inadvertence, happenstance, or habit, as opposed to through mutual, knowing assent, does not create an obligation to follow that practice in the future. *See Consolidation Coal Co.*, 106 LA 328 (1996) (attached at tab B).

Furthermore, Plaintiffs have failed to establish the existence of a longstanding practice of crediting MXUU-coded time for IBEW-represented employees for FMLA purposes. Plaintiffs have presented the declarations of only three stewards (Maples, Byrnes, and Stoner) who asserted that they received FMLA leave prior to November 2005. IBEW Vice President Kevin Curran asserts in his declaration that he is "not aware of any cases prior to December 2005 in which a Union employee was denied FMLA leave for failing to meeting the 1,250-hour requirement." (Curran Decl. ¶ 14). However, this assertion is meaningless as there is no evidence that Curran has personal knowledge as to all of the FMLA leave requests of IBEW-represented employees and the Company's reason for any denials of such requests.[4] Curran's additional assertion that "[b]etween 1998 and December 2005, the Company credited steward hours spent on duties currently coded MXUU toward FMLA eligibility" (Curran Decl. ¶ 26) is likewise not supported by

---

[4] Contrary to Curran's assertion, there have been numerous instances in which Illinois Bell employees, both IBEW and CWA members, have been denied FMLA leave for failing to meet the 1,250-hour requirement, as for example, when such employees have been off work for lengthy periods qualifying for disability benefits due to an inability to perform their jobs.

proof that he has personal knowledge of the Company's decision-making regarding all such FMLA leave requests (which is highly unlikely). For all of the foregoing reasons, Plaintiffs have failed to establish that the Company had a recognized custom and practice of counting MXUU-coded time for IBEW-represented employees for FMLA purposes.

Plaintiffs' suggest that the authorities cited by Illinois Bell in support of its interpretation of the terms "adjusting grievances" carry little weight because "Illinois Bell offers no authority supporting its argument that courts construing the FMLA or the FLSA should look to the NLRA for guidance." (Pl.s' Mem. at 20). Significantly, Plaintiffs do not dispute that "adjusting grievances" is a term of art under federal labor law, and even cite cases under the NLRA themselves in support of their position. Thus, there is no good reason the Court should not consider interpretations of those terms in the labor law context. Furthermore, courts have looked to cases arising under the NLRA for guidance on the interpretation of terms used in that Act. *See, e.g., Vanderhoof v. Life Extension Institute*, 988 F.Supp. 507, 512 and n.1 (D.N.J. 1997) (considering NLRA cases interpreting "successor in interest" in resolving interpretation issue under the FMLA).

Plaintiffs next contend that Illinois Bell misinterprets the NLRA in arguing that "adjusting grievances" is limited to the act of resolving, i.e., deciding or settling, grievances. (Pl.s' Mem. at 20). Plaintiffs criticize Illinois Bell's reference to Section 2(11) of the NLRA, 29 U.S.C. § 152(11), and cases interpreting its use of the terms "adjusting grievances," and state that Section 8(b)(1)(B), 29 U.S.C. § 158(b)(1)(B), is more relevant. However, both statutory provisions use the terms "adjusting grievances" and neither the NLRA nor any case law suggest that those terms have different meanings under those sections. Plaintiffs' further assert that cases interpreting the terms under

Section 2(11) are inapplicable because they focus on supervisors' authority to resolve complaints on the employer's behalf, rather than on investigation and evaluation of grievances. (Pls.' Mem. at 21). However, this does not make sense. Supervisors must investigate and evaluate grievances, too, before making a decision on whether to grant, deny, or settle them. It is the authority to adjust, i.e., decide or settle, the grievances that makes an employee a supervisor, as the cases cited by Illinois Bell – and Plaintiffs, too, as discussed next – explain.

The cases which Plaintiffs assert support a broad interpretation of grievance adjustment actually support the more narrow interpretation advocated by Illinois Bell. (Pl.s' Mem. at 22-23). In discussing authority to adjust grievances in those cases, the NLRB focused on the supervisors' actual authority to decide grievances, and referenced grievance investigation as a separate activity that may be required to adjust (i.e., decide, settle) a grievance. If grievance adjustment included all grievance-related activities as Plaintiffs claim, there would be no need for the NLRB in these cases to mention investigation separately, or refer to "activities related to" grievance adjustment. *See Florida Power & Light Co. v. International Bh'd of Elec. Workers, Local 641*, 417 U.S. 790, 803, 805 (calling grievance adjustment and collective bargaining "particular and explicitly stated activities," and referring separately to "activities related thereto").

Furthermore, in addition to Sections 2(11) and 8(b)(1)(B) of the NLRA, the terms grievance adjustment are also used in Section 9(a), which provides that "any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances *adjusted*, without the intervention of the bargaining representative, as long as … the bargaining representative has been given

opportunity to be present at such *adjustment*." 29 U.S.C. § 159(a) (emphasis added). The use of the terms in this provision further supports Illinois Bell's view that grievance adjustment refers to the actual decision or settlement of the grievance, not its investigation, evaluation, or other grievance-related activity. The right granted an employee in this provision is the right to have a grievance *decided*, not just investigated or evaluated, the latter of which have little benefit without a resolution. And the right granted a bargaining representative in this provision is to be present if the employer *meets* with the employee to *resolve*, i.e., adjust, a grievance.

For the foregoing reasons and those stated in Illinois Bell's opening brief, the Plaintiffs' broad interpretation of "adjusting grievances" should be rejected in favor of the interpretation adopted by the NLRB and other authorities, which is that grievance adjustment refers to the act of resolving (i.e., deciding or settling) a grievance, and not all grievance-related activities, such as investigation and evaluation. Applying this interpretation, there is no question that Illinois Bell complies with 29 C.F.R. § 785.42 by counting as "hours worked" under the FLSA and as "hours of service" under the FMLA all time IBEW stewards spend meeting with Company representatives to resolve grievances, i.e., MXUP-coded time.[5]

Plaintiffs concede that activities that fall outside 29 C.F.R. § 785.42 are subject to the *Tennessee Coal* test, i.e., that the activity is controlled or required by Illinois Bell and

---

[5] If the Court were to accept Plaintiffs broad interpretation of "adjusting grievances" to include all grievance-related activities, it could not grant Plaintiffs' summary judgment motion. Plaintiffs admit that not all MXUU-coded time relates to grievances. Some of it relates to internal union business and training. While Plaintiffs claim in their declarations that 95% of their time is spent in grievance-related activities, there is no showing that is based on anything other than speculation. Thus, the parties would need to engage in discovery on the issue of how much time each Plaintiff-employee spent on grievance-related activities as opposed to other union-related business.

is pursued necessarily and primarily for Illinois Bell's benefit. Plaintiffs do not attempt to argue that grievance-related activities other than the act of resolving a grievance satisfy the *Tennessee Coal* test. That is because, as set forth in Illinois Bell's opening brief, the law and the facts are against them. Thus, if the Court agrees that grievance adjustment should be interpreted narrowly and specifically as Illinois Bell advocates, it should also find that time spent by IBEW stewards on union-related business other than in grievance resolution meetings with Company representatives does not meet the *Tennessee Coal* test, and thus need not be counted for FMLA eligibility purposes as hours worked.

Also significant, Plaintiffs have failed to respond to Illinois Bell's arguments that their position is contrary to Congressional intent, and that stewards can adjust the amount of time they spend in MXUU-coded activities if necessary to be eligible for FMLA leave. (Def.'s Mem. at 10-12). That is because the policy underlying the FMLA's 1,250-hour eligibility requirement further undermines Plaintiffs' claim.

## **CONCLUSION**

For the foregoing reasons and those stated in its opening brief, Illinois Bell requests that the Court grant Illinois Bell's motion for partial summary judgment and deny Plaintiffs' cross-motion for partial summary judgment.

Respectfully submitted this 28th day of July, 2008.

ILLINOIS BELL TELEPHONE COMPANY


By:  s/Laura A. Lindner
          One of Its Attorneys

Laura A. Lindner
Jeremiah C. Van Hecke
LINDNER & MARSACK, S.C.
411 East Wisconsin Ave. – Suite 1800
Milwaukee, WI 53202
Phone:  414-273-3910
Fax:  414-298-9873
llindner@lindner-marsack.com
jvanhecke@lindner-marsack.com

Stephen B. Mead
AT&T Legal Department
225 West Randolph Street
Suite 25A
Chicago, IL 60606
(312)727-3506
stephen.mead@att.com

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEBORAH MAPLES, ET AL        )
    Plaintiffs            )
                          )
VS.                          ) Case No. 07-C-675
                          )
ILLINOIS BELL TELEPHONE      ) Judge Castillo
COMPANY                      ) Magistrate Judge Nolan
    Defendant             )

**************************************************************

TELEPHONIC ORAL DEPOSITION OF JOE ATILANO

MAY 12, 2008

VOLUME 1 OF 1



**************************************************************

    ORAL DEPOSITION OF JOE ATILANO, produced

as a witness at the instance of the Plaintiff, and

duly sworn, was taken in the above-styled and numbered

cause on the 12th of May, 2008, from 2:10 p.m. to

4:40 p.m., VIA TELEPHONE, before DANDY ELLIS, CSR in

and for the State of Texas, reported by machine

shorthand, at AT&T, 105 Auditorium Circle, San

Antonio, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

*   *   *   *   *   *   *   *   *   *   *

EXHIBIT

A

DEBORAH MAPLES, ET AL                                    JOE ATILANO
ILLINOIS BELL TELEPHONE COMPANY

Page 6

1  Local 21 during this deposition, I may refer to it as
2  the Union or as IBEW or as Local 21, and I invite you
3  to do so as well.
4      A. Okay.
5      Q. And when I'm referring to the defendant in
6  this case, Illinois Bell Telephone Company, I may
7  refer to it as "Illinois Bell," or as "the company,"
8  or as "the employer," and I invite you to do so as
9  well. Do you understand what I have just told you?
10     A. Yes, sir.
11     Q. Do you have any questions before we begin?
12     A. No, sir.
13     Q. All right. What is your current position
14  with AT&T?
15     A. I'm an associate director with HR operations
16  in the FMLA and leave of absence administration
17  teams.
18     Q. How long have you held this position?
19     A. July of 2001.
20     Q. And were you employed by AT&T prior to
21  July 2001?
22     A. Yes, I was.
23     Q. And could you give us the history of your
24  employment with the company?
25     A. Yes, sir. Was hired on as a full-time

Page 7

1  employee in early 1999 as a -- as a disability
2  consultant. And I was in that position for maybe a
3  little over a year and became a team lead in that
4  same -- in that same group. And after -- after about,
5  I don't know, I'm not sure how long I was in that
6  position, but was promoted to the position I'm in
7  now.
8      Q. Okay. Just so I'm clear, the company you're
9  employed by is AT&T Services, Inc.; is that correct?
10     A. Correct.
11     Q. So that is the company that you served as
12  disability consultant?
13     A. That was SBC Services, Inc. at the time.
14     Q. That's the predecessor to AT&T Services,
15  Inc.?
16     A. Yes, sir.
17     Q. Have you worked for any other affiliates of
18  AT&T or SBC?
19     A. I did -- No, I have not.
20     Q. And what are your job duties?
21     A. My primary responsibilities are for
22  developing and implementing methods and procedures
23  related to FMLA and leaves of absence. I also have
24  oversight for internal and external training of FMLA
25  procedures, as well as leave procedures. And I also

Page 8

1  have oversight for our project management initiative,
2  which would include any type of a system enhancement,
3  process enhancements involving systems. And that -- I
4  think that's it, in a nutshell.
5      Q. You have indicated in your declaration in
6  this case that Illinois Bell uses a mechanized system
7  for determining whether an employee has met the FMLA's
8  1250 hour eligibility requirement. What is the
9  mechanized system?
10     A. I'm sorry, can you -- can you explain that --
11  the question? I'm sorry, I just want to make sure I
12  understand.
13     Q. Sure. You make reference to something called
14  a mechanized system in your declaration that's been
15  submitted in this case.
16     A. Okay.
17     Q. What is -- what does that term, mechanized
18  system, refer to?
19     A. It's a -- It's a module within our payroll
20  system which is called eLink. And that -- that module
21  within that system is what calculates FMLA eligibility
22  based on time being reported.
23     Q. And has there been more than one mechanized
24  system in use at -- for Illinois Bell?
25     A. No.

Page 9

1      Q. When was the mechanized system created?
2      A. In 2003.
3      Q. Can you be more specific?
4      A. I believe it was around May of 2003. I don't
5  remember the exact date. I'm sorry.
6      MS. LINDNER: Do you mean when it was
7  implemented or the period of time when it was under
8  development?
9      MR. BLOCH: Fair question.
10     Q. (BY MR. BLOCH) Let's start with when it was
11  first implemented.
12     A. It was implemented in, I believe it was
13  May 2003.
14     Q. Are you -- Are you looking at any documents?
15     A. I am not.
16     Q. Okay. If you feel the need to look at any
17  documents, please let me know.
18     A. Okay. Thank you.
19     Q. And were you -- were you involved in the
20  creation and implementation of the mechanized system?
21     A. I was.
22     Q. Okay. And over what period of time was the
23  mechanized system first established?
24     A. Can you please clarify the question?
25     Q. How was it created?

3 (Pages 6 to 9)

DEBORAH MAPLES, ET AL                                              JOE ATILANO
ILLINOIS BELL TELEPHONE COMPANY

Page 10

1    A.  How was it created?  Are you asking about a
2    timeline?
3    Q.  How did -- How did you come to be involved in
4    the establishment of the mechanized system?
5    A.  Well, as -- as having oversight for -- again,
6    for project management and system enhancements,
7    that's -- that's how I was involved in the development
8    of the system as it was -- again, it was a process
9    enhancement, so that's how I came to be involved.
10   Q.  What do you mean by the term "process
11   enhancement"?
12   A.  Prior to it being automatically -- or system
13   calculated, it was, I believe it was just a manual
14   process.
15   Q.  And did you play a role in the creation of
16   the mechanized system?
17   A.  I did.
18   Q.  Okay.  What was your role?
19   A.  I was the project manager responsible for
20   collecting the, what you would refer to as business
21   requirements that would be given to our partners in IT
22   to actually program the system or the module.
23   Q.  Now prior to the implementation of the
24   mechanized system, did you have -- did you have a role
25   with respect to the FMLA policies followed by the

Page 11

1    defendant, Illinois Bell?
2         MS. LINDNER:  I'm going to object on the
3    grounds that it's overbroad.  Form.
4    Q.  (BY MR. BLOCH) You can still answer it.
5    A.  Okay.  Can you please -- Can you please, I
6    guess clarify what processes or policies you're
7    referring to?  Is that a fair question?
8    Q.  Well, you said that before you had the
9    automatic calculation, it was a manual process.
10   A.  Yes, sir.
11   Q.  Right?
12   A.  Yes, sir.
13   Q.  So the -- the process of determining whether
14   someone was eligible for FMLA was done manually; is
15   that right?
16   A.  Correct.
17   Q.  Okay.  Now you have been -- you have held
18   your position since 2001, right?
19   A.  Correct.
20   Q.  Did you oversee the determination of FMLA
21   eligibility from -- during the time you were -- you
22   held your position up until the implementation of the
23   mechanized system?
24   A.  I did not.
25   Q.  What role, if any, did you have?

Page 12

1    A.  With respect to the eligibility calculation
2    or -- I'm sorry, can you be more --
3    Q.  Sure.  What -- Why you don't tell us what you
4    did between July 2001 and the -- the implementation of
5    the mechanized system, okay?  It's an approximately
6    two-year period.
7    A.  Okay.
8    Q.  Describe for us, as best you know, how FMLA
9    leave was accounted for.
10        MS. LINDNER:  Objection to form.
11        You're asking how was eligibility
12   calculated in that time frame?
13   Q.  (BY MR. BLOCH) Mr. Atilano, do you understand
14   the question?
15   A.  I don't.  You said how it was -- I believe
16   you said how it was tracked.  I guess I'm having a
17   hard time discerning whether you're asking me
18   specifically -- if you're asking me questions specific
19   to how eligibility was determined or whether you're
20   just talking about what my responsibilities were in
21   general.
22   Q.  All right.  Well, let's talk about your
23   responsibilities, first.
24   A.  Okay.
25   Q.  What were your responsibilities between July

Page 13

1    2001 and May 2003 with respect to FMLA processing?
2    A.  Similar to what I described at the opening.
3    Implementation and development of methods and
4    procedures, but mostly for our internal administrative
5    team, the team that processed the FMLA requests.
6    Q.  What -- Was there a specialized team that
7    processed the requests during that pre-mechanized
8    period?
9    A.  That's correct.
10   Q.  And who -- You say you developed methods and
11   procedures for that team?
12   A.  Yes, I was involved in that and in the
13   implementation of that.
14   Q.  Okay.  So are you aware as to how the
15   decisions were made for granting or denying FMLA leave
16   during the period July 2001 through May of 2003?
17   A.  Can you -- I guess can you clarify?  Again,
18   are we talking about just in general or are we talking
19   about leave -- are we talking about like the
20   eligibility or maybe the amount of leave people had
21   available to them?
22   Q.  All right.  Let's start over.  We're going to
23   be here a long time.
24   A.  Okay.  I just want to make sure I understand
25   your question.  I don't --

4 (Pages 10 to 13)

DEBORAH MAPLES, ET AL                                    JOE ATILANO
ILLINOIS BELL TELEPHONE COMPANY

Page 14

1    Q. Why you don't answer it as you understand
2  it. If you don't understand it, that's fine. But if
3  you -- answer it as you understand it, and if I'm
4  unhappy with your answer, I'll ask you a follow-up.
5    A. I'm sorry, I was just following your
6  instructions from the opening.
7    Q. That's all right. If you don't understand,
8  that's fine.
9    A. Okay. Thank you.
10   Q. This might take a while, that's all.
11   A. Okay. That's fine.
12   Q. All right. What was the name of the team
13  that -- you say you developed methods and procedures.
14  Let me back up.
15   A. Okay.
16   Q. The questions I'm about to ask you cover the
17  period of time prior to implementation of the
18  mechanized system in or around May of 2003, okay?
19   A. Right.
20   Q. We're talking about the -- the manual, the
21  period where it was done manually, all right?
22   A. Right.
23   Q. Okay. So that's approximately July of 2001
24  until approximately May of 2003?
25   A. Okay.

Page 15

1    Q. We're clear on that?
2    A. Yes, absolutely.
3    Q. Now, you said, I believe, that you developed
4  the methods and procedures that were utilized by the
5  team that administered FMLA; is that correct?
6    A. Correct.
7    Q. Okay. How do we -- How should I refer to
8  that team?
9    A. The FMLA processing unit.
10   Q. Okay. And did you oversee the operation of
11  the FMLA processing unit?
12   A. Of the -- Yes, of the FMLA processing unit.
13   Q. Okay. What was your job?
14   A. My title, my job -- well, I was -- I was the
15  associate director. And again, my job was to oversee
16  the development and implementation of those methods
17  and procedures. And --
18   Q. Okay. Was there a uniform method or
19  procedure with regard to the handling of requests for
20  FMLA leave during that period?
21      MS. LINDNER: Objection to the form of
22  the question.
23      MR. BLOCH: Okay.
24   Q. (BY MR. BLOCH) Mr. Atilano, I'm sure you know
25  that just because an objection is made, you still go

Page 16

1  ahead and answer.
2    A. I'm sorry. Sorry about that. I missed that.
3      With respect to the processing of the
4  request, yes, there were -- there were uniform
5  policies within the internal administrative team, the
6  FMLA processing unit.
7    Q. Okay. If I heard you right, you said with
8  respect to the processing of requests for FMLA there
9  were some uniform procedures; is that right?
10   A. That is correct.
11   Q. Okay. Were there any uniform procedures in
12  place with respect to determining whether the person
13  making the request had satisfied the 1250 hour
14  requirement under the FMLA?
15   A. I do not believe so, or not that I'm aware
16  of.
17   Q. How were those -- How was that determination
18  made, to the best of your knowledge?
19   A. To the best of my knowledge, it was made
20  by -- by the -- the supervisor or the supervisor's
21  designee, an attendance manager in some place. But
22  each -- I believe each center or each work location
23  had their own process for doing that.
24   Q. Okay. Did you or your department issue any
25  instruction or directives to the work locations or

Page 17

1  departments and supervisors with respect to making
2  that determination relating to the 1250 hour
3  requirement?
4    A. I do not -- I do not believe we had any -- we
5  had given them any instructions prior to 2003.
6    Q. Did you ever -- If someone was denied FMLA
7  leave during that period of time, and wanted to appeal
8  the denial, did your department or your office hear
9  those appeals?
10   A. Well, we didn't have an appeal process,
11  per se. But challenges to determinations -- or
12  challenges to denials were brought to -- to my team
13  and I.
14   Q. Okay. Were you ever brought any challenges
15  relating to denials of FMLA leave based on the
16  1250 hour requirement?
17   A. I don't remember any specific ones. But to
18  the best of my knowledge, I'm guessing that I did, or
19  I did have some of those.
20   Q. Were you aware whether any employees were
21  ever denied FMLA leave requests based on failing to
22  meet the 1250 hour requirement?
23   A. Yes.
24      MS. LINDNER: Ever?
25      MR. BLOCH: Again, all of my questions

5  (Pages 14 to 17)

DEBORAH MAPLES, ET AL                                                JOE ATILANO
ILLINOIS BELL TELEPHONE COMPANY

Page 22

1    the labor contract between IBEW and Illinois Bell?
2        A.  That was the first time that that difference
3    was brought to my attention.
4        Q.  That's not my question.  Was that the first
5    time you examined the labor contract?
6            MS. LINDNER:  Objection to form.
7        A.  Yeah, I -- I didn't -- I didn't examine the
8    labor contract.  I relied on information given to me
9    from other contacts to appropriately code or designate
10   hours as worked or not worked in that eligibility
11   module.
12       Q.  (BY MR. BLOCH) Mr. Atilano, please answer my
13   question.  Had you examined the labor contract between
14   the Local 21 and Illinois Bell prior to July 2007?
15           MS. LINDNER:  Ever?
16           MR. BLOCH:  Ever.
17       A.  I -- I can't -- I don't recall.  I can't -- I
18   can't say that I had or that I hadn't.  I'm sorry.
19       Q.  (BY MR. BLOCH) Well, when -- What's the first
20   time that you can actually recall looking at the labor
21   contract?
22       A.  Quite honestly, I don't know that I ever
23   did.
24       Q.  And who did you rely on to give you
25   information about the coding of hours for purposes of

Page 23

1    FMLA eligibility?
2            MS. LINDNER:  Objection to the form of
3    the question.  Overbroad.
4        A.  Yeah.  And would you -- would you mind, I
5    guess -- are you referring to, again, the post-May
6    2003 implementation of the mechanized process, or are
7    you talking about prior to that when it was in
8    development?
9        Q.  (BY MR. BLOCH) No, I'm -- All these questions
10   now pertain to the period of time from May 2003, when
11   the mechanized system was implemented, forward, and
12   for Illinois Bell.
13       A.  Okay.
14       Q.  And you testified a minute ago, if my notes
15   are right, that you were -- relied on information from
16   others with respect to the coding of hours for
17   purposes of FMLA eligibility; is that right?
18       A.  I'm sorry, can you please repeat that
19   statement.
20       Q.  I believe you said a minute ago that you
21   relied on information received from others with regard
22   to the coding of hours for purposes of FMLA
23   eligibility.
24       A.  Yeah, I believe I said for the
25   classification, not -- I don't think it was coding.

Page 24

1    But generally, I think that's right.
2        Q.  And prior to -- prior to this period in July
3    of 2007, when a discrepancy was brought to your
4    attention, what was your understanding with respect to
5    the classification of hours that were unpaid and spent
6    on union business?  This is for Illinois Bell.
7        A.  My understanding, the -- the only thing that
8    I had been able to verify prior to that -- prior to
9    July of 2007, was that unpaid union time for CWA
10   members counted as hours worked.  As far as the IBEW
11   members, I don't believe that I -- that anyone had
12   ever confirmed whether or not those hours counted.  I
13   may have relied on the information given to me related
14   to the CWA.
15       Q.  What do you mean by that?
16       A.  Meaning that I may have assumed that if we
17   were counting those types of hours as hours worked for
18   CWA, that it applied to the IBEW as well.
19       Q.  When you say CWA, are you referring to
20   Communication Workers of America?
21       A.  I am.
22       Q.  Is that -- And are you further referring to
23   employees of AT&T or its affiliates who were
24   represented, for bargaining purposes, by the
25   Communication Workers of America?

Page 25

1        A.  Yes, I -- Yes.
2        Q.  Were you the one who was ultimately in charge
3    of deciding how time was accounted for in the FMLA
4    processing unit?
5            MS. LINDNER:  Objection form.
6        A.  I was the person in charge of gathering all
7    of that information, gathering all of those
8    requirements and giving them to our IT partners.
9        Q.  (BY MR. BLOCH) Who made the decision how
10   hours were going to be classified for purposes of FMLA
11   eligibility?
12       A.  I relied on several parties when I was
13   gathering those requirements.
14       Q.  Yes.  But who made the final call on that?
15       A.  Well, I suppose it depended.  I reached out
16   to business -- to business partners that we had.  I
17   spoke to members of our labor relations teams, perhaps
18   even reached out to leg-- -- to members of AT&T legal
19   as well, or SBC legal at the time.  But ultimately,
20   after I got the feedback from those parties as to what
21   did or did not count as hours worked, ultimately I was
22   the person that had to sign off on those business
23   requirements for the system --
24       Q.  Okay.
25       A.  -- that calculates the eligibility.

7  (Pages 22 to 25)

DEBORAH MAPLES, ET AL                                                    JOE ATILANO
ILLINOIS BELL TELEPHONE COMPANY

---

Page 26

1    Q. Is that -- Was that the case from the -- from
2  May of 2003 forward?
3    A. That is correct.
4    Q. Okay. Now, in May 2003 -- Excuse me, how do
5  we refer to your business group? Are you a
6  department? How do I refer to you and your people?
7    A. You can refer to it as the FMLA processing
8  unit.
9    Q. Okay. All right. In May 2003, with regard
10 to Illinois Bell, when the mechanized system was
11 implemented, how did the FMLA processing unit account
12 for absences, unpaid absences for union business?
13   A. Well, I can tell you from -- just from
14 familiarizing myself with -- with the -- with the case
15 when I was doing my declaration, that I had -- I
16 verified that at the time unpaid union time was
17 being -- I believe was being counted as hours worked.
18   Q. That would be for purposes of FMLA
19 eligibility?
20   A. Correct.
21   Q. So the hours that were -- where an employee
22 was absent for union business was credited towards the
23 1250 hour requirement for FMLA eligibility, correct?
24   A. That is what the system -- that is how the
25 system was -- was picking up that time, sir.

---

Page 27

1    Q. Was that -- Did that apply to any other
2  business units other than Illinois Bell?
3    A. I believe it did.
4    Q. Okay. Do you know where it was in effect?
5    A. I don't know all of the specific areas, no,
6  I'm sorry.
7    Q. And do you know how the decision was made to
8  include the hours of unpaid absence for union business
9  among the hours for FMLA eligibility?
10       MS. LINDNER: Objection, asked and
11 answered.
12   A. And again, we're talking about just Illinois
13 Bell, correct?
14   Q. (BY MR. BLOCH) Yes.
15   A. Okay. Well, as I had -- as I had stated
16 earlier, I had confirmed that that activity, that that
17 type of activity was counted as hours worked for
18 purposes of FMLA eligibility for CWA union stewards.
19 And I -- I mean, I guess I assumed that -- that the
20 same would apply for IBEW. I had tried to verify it,
21 but was unsuccessful in verifying it, so I think I
22 erred on the side of caution and applied the same
23 rules that I had verified for CWA and applied them to
24 the IBEW as well.
25   Q. And how did you attempt to verify it?

---

Page 28

1    A. I had reached out to a labor contact, labor
2  relations contact, I'm sorry, to try to verify that.
3    Q. What happened?
4    A. I did not get a response.
5    Q. Did you try more than once?
6    A. If I recall correctly, I tried on -- I tried
7  a couple of times. I'm pretty certain of that.
8    Q. Now, I believe you testified that the -- the
9  hours of unpaid absence for union business were
10 included among the hours necessary to meet the
11 1250 hour FMLA requirement since the system was first
12 implemented, the mechanized system, in May 2003; is
13 that correct?
14   A. Yes, I believe that's correct.
15   Q. Okay. Do you -- Did you follow the course of
16 contract negotiations with -- between the company and
17 the CWA?
18   A. I'm sorry, can you repeat that question?
19   Q. Sure. Did you follow the progress of
20 contract negotiations between your employer and the
21 CWA?
22   A. I -- I'm not sure. I'm sorry, I don't -- I'm
23 not sure what it means if -- whether I followed the
24 course of progress, is that --
25   Q. Were you aware of those negotiations when

---

Page 29

1  they were going on?
2    A. No, I was not.
3    Q. Okay. Do you know when the CWA labor
4  contract first addressed the question or the issue of
5  accounting for unpaid absences for union business?
6    A. I am not.
7    Q. What is the basis for your statement that the
8  CWA counted those unpaid hours for union business back
9  in May of 2003?
10   A. And I'm sorry, I think I need to clarify. I
11 think that the company counted those as hours worked,
12 not -- I don't think the CWA.
13       But my basis for that was, again, as I
14 had stated before, I relied on input from either labor
15 relations, AT&T legal, or -- or in some cases, our
16 partners from the business side or from HR to help me,
17 you know, verify how those hours were to be treated.
18   Q. Okay. So let me see if I understand this.
19 In May of 2003, when the mechanized system was
20 implemented, you were informed that unpaid absences
21 for union business, CWA members, were included for
22 purposes of reaching the 1250 hour requirement?
23   A. Yes, I believe that's correct.
24   Q. Then you -- You determined that that -- that
25 that accounting of hours would also be applicable for

---

8 (Pages 26 to 29)

DEBORAH MAPLES, ET AL                                      JOE ATILANO
ILLINOIS BELL TELEPHONE COMPANY

Page 30

1  the IBEW?
2      MS. LINDNER: Objection to the form of
3  the question. Mischaracterizes prior testimony.
4      A. Yeah, after -- after attempting to confirm
5  that, and unsuccessfully, I did -- I did assume that
6  it -- that it would follow the same rules.
7      Q. (BY MR. BLOCH) Okay. Had anyone told you
8  that there was specific CWA contract language
9  accounting for that time back in May of 2003?
10     A. I can't recall whether they cited specific
11  language.
12     Q. Mr. Atilano, let me just make sure I
13  understand this. In May of 2003, with regard to
14  Illinois Bell and the IBEW, did you speak to anyone at
15  all about this question of unpaid absences for union
16  business?
17     A. And again, this is -- you're referring to
18  just Illinois Bell and whether it was IBEW time or CWA
19  time, right? You're just talking in general?
20     Q. No. I'm talking about the period around
21  May 2003 when you implemented the mechanized system.
22     A. Right.
23     Q. And specifically with regard to Illinois Bell
24  and the IBEW.
25     A. Okay.

Page 31

1      Q. My question is, did you speak to anybody
2  about the question of accounting for unpaid absences
3  for union business?
4      A. I don't recall whether -- I don't recall, or
5  I don't believe I spoke to anyone.
6      Q. Okay. Do you recall the specific code that
7  was used to identify unpaid absence for union
8  business?
9      A. Yes, I think it's MXUU.
10     Q. Okay. And do you recall the code that was
11  used for paid time for certain union business?
12     A. Yes, I think that's MXUP.
13     Q. Okay. So is it correct that the -- that the
14  codes MXUU and MXUP have been utilized since the
15  mechanized system was first implemented in May 2003?
16     A. Yes, I think they've been around that long.
17     Q. Okay. And since -- I know I'm being
18  repetitious, but I'm just going to state it another
19  way. That in May 2003, both MXUU time and MXUP time
20  was credited for purposes of satisfying the 1250 hour
21  FMLA requirement, correct?
22     A. Yes, that's how the system was picking it up,
23  correct.
24     Q. Okay. At what time, if any, did the company
25  stop crediting MXUU time toward the 1250 hour

Page 32

1  requirement?
2      A. I believe that happened -- that happened
3  around July of 2005. And I don't -- I don't know the
4  specific date. I'm sorry.
5      Q. What happened? Why did you stop recognizing
6  it?
7      A. The -- I guess someone -- someone had brought
8  it to my attention that there could have been a
9  potential problem with the module for the
10  calculation. And when I -- I probed into it, I
11  discovered that someone from IT, the IT -- the
12  programer had -- had gone in and made some changes
13  while they were making some -- some changes to another
14  payroll module.
15     Q. What changes had the IT programer made?
16     A. You mean that affected the MXUU time
17  specifically?
18     Q. Yes. You said you discovered that an IT
19  programer was making changes.
20     A. Yes, correct.
21     Q. What were those changes?
22     A. Well, the change that was made was that MXUU
23  was designated as hours not worked for -- for both CWA
24  and IBEW members.
25     Q. Was this change made -- was this change that

Page 33

1  the IT programer had made authorized?
2      A. It -- It was not.
3      Q. Was it accidental?
4      A. It was.
5      Q. And who brought the matter to your attention?
6      A. Georgine Bauer. I'm not sure what her --
7  what her title was at the time. I just referred to
8  her as an attendance manager.
9      Q. Where?
10     A. I know she's in the midwest region, but I'm
11  not sure what city or state she's in.
12     Q. Okay. What did you do after she -- after
13  Ms. Bauer brought the matter to your attention?
14     A. I contacted our IT partners so that we
15  could -- so we could rectify it as quickly as
16  possible.
17     Q. Do you know when the -- when the change had
18  been made?
19     A. I don't recall the specific date.
20     Q. Do you know how long the change had been in
21  effect when it was brought to your attention?
22     A. I don't remember that.
23     Q. Okay. So what did you do next?
24     A. Well, I -- Georgine actually verified or
25  confirmed for me that -- that there were, I guess --

9 (Pages 30 to 33)

DEBORAH MAPLES, ET AL                                              JOE ATILANO
ILLINOIS BELL TELEPHONE COMPANY

---

Page 34

1   that there was, I'm sorry, a difference between how
2   the MXUU time was treated for IBEW versus CWA
3   members. And I then proceeded to contact our IT
4   partners to begin a work request to rectify the
5   programming.
6       Q.  How do you spell Ms. Bauer's name?
7       A.  B-a-u-e-r.
8       Q.  And were her duties and responsibilities, did
9   they concern IBEW represented employees or CWA
10  represented employees?
11      A.  I don't know that, I'm sorry.
12      Q.  Did Ms. Bauer tell you the basis for her
13  understanding as to the differences between the IBEW
14  and the CWA?
15      A.  I believe she -- she may have confirmed it
16  with either someone from labor relations or someone
17  from -- from SBC or AT&T -- I think it was SBC
18  actually, SBC legal. But -- but I don't remember the
19  exact basis of that.
20      Q.  Based on what she told you -- Strike that.
21          Did you act on the basis of any
22  information other than what you received from
23  Ms. Bauer?
24      A.  I don't believe I did.
25      Q.  What action did you take?

---

Page 35

1       MS. LINDNER: Objection, asked and
2   answered.
3       A.  I submitted a work request to -- to IT to
4   have that -- the program corrected.
5       Q.  (BY MR. BLOCH) Yes. Corrected in what way?
6       A.  Well, to switch the MXUU back to hours work
7   worked for CWA, but to leave it as hours not worked
8   for IBEW.
9       Q.  And was your directive implemented?
10      A.  It was.
11      Q.  When was it implemented?
12      A.  In November of that year.
13      Q.  When did you submit the directive?
14      A.  I -- I don't recall that date, I'm sorry.
15      Q.  Well, you said that Ms. Bauer notified you of
16  the problem in July of 2005, correct?
17      A.  No, I said that the -- that in July of 2005
18  was when, I guess, the discrepancy I think -- or when
19  the switch happened. But I can't recall when she --
20  when she actually brought it to my attention.
21      Q.  Well, I believe you testified that in July of
22  2005 someone told you there could be a problem with
23  the calculation.
24      MS. LINDNER: Objection, asked and
25  answered. He's answered the question. We're not

---

Page 36

1   going to argue about it. The record speaks for
2   itself.
3       Q.  (BY MR. BLOCH) You can answer. You can just
4   ignore the objections, those are just for the
5   lawyers.
6       MS. LINDNER: Well, maybe, maybe not.
7       Q.  (BY MR. BLOCH) Mr. Atilano --
8       MS. LINDNER: I don't think -- I don't
9   think you asked a question. You made an argument or
10  some sort of statement about what you thought the
11  record reflected. And my point is the record reflects
12  what it reflects.
13      MR. BLOCH: Okay.
14      MS. LINDNER: We have a court reporter
15  here. If you have a question, ask a question.
16      MR. BLOCH: Your objection is noted,
17  Laura. Are you directing him not to answer the
18  question?
19      MS. LINDNER: No. There is no question
20  pending, as far as I could tell.
21      Q.  (BY MR. BLOCH) All right. Here's my
22  question. I believe you testified a few minutes ago
23  that someone told you in July of 2005 there could be a
24  problem with the calculation. Were you referring
25  to -- or were you thinking of your conversations with

---

Page 37

1   Ms. Bauer?
2       A.  That's -- That's what I could have been
3   referring to. And -- But again, I don't remember
4   exactly when she brought it to my attention. So if I
5   misstated something earlier, I -- you know, I guess --
6   I guess that should be noted.
7       Q.  Mr. Atilano, there's no problem with that. I
8   just need to be sure that I understand everyone you
9   spoke to in connection with this and how it happened.
10  And if I recorded it wrongly or you said it wrongly,
11  that's okay, we'll get the record straight. I just
12  want to be sure I've got the whole picture, that's
13  all.
14      A.  Okay. Understood. Thank you.
15      Q.  Do you know how to reach Ms. Bauer?
16      A.  I believe I can, yes.
17      Q.  How do you reach her, by phone?
18      A.  By phone or by e-mail.
19      Q.  When the changes that you have described were
20  implemented in or around November of 2005, did you
21  direct that the IBEW be notified of the change?
22      A.  I did not.
23      Q.  Are you aware if anyone did notify the IBEW?
24      A.  No, I'm not.
25      Q.  It's correct that -- that the IBEW

---

10  (Pages 34 to 37)

⊕ **Labor and Employment Law**
Library

Source: Arbitration Decisions > Labor Arbitration Decisions > CONSOLIDATION COAL CO. --, 106 LA 328 (Arb. 1996)

**106 LA 328**

**CONSOLIDATION COAL CO. --**

**Arbitration**

Case No. 93-6-95-77

March 18, 1996

**In re CONSOLIDATION COAL COMPANY (McELROY MINE) and UNITED MINE WORKERS OF AMERICA, DISTRICT 6, LOCAL 1638**

## Arbitrator(s)

Arbitrator: Matthew M. Franckiewicz

## Headnotes

### JOB POSTING

**-- Shift preference -- Past practice▶ 119.121 ▶ 117.233▶ 24.369**

Senior successful bidders, in case of multiple bids for same position on rotating shifts, are entitled to select shifts they prefer, where past practice was to give this preference.

**-- Shift preference -- Past practice▶ 119.121▶ 117.233▶ 24.369**

Union proved past practice that senior successful bidders, in case of multiple bids for same position on rotating shifts, are entitled to select shifts they prefer, even though not all employees took advantage of this practice, where local president testified that practice was followed on two occasions affecting him, union offered hearsay evidence that practice existed, some employees' failure to claim benefit of past practice does not negate its existence, and superintendent told local president he was going to change practice, thereby acknowledging its existence.

**-- Shift preference -- Past practice▶ 119.121▶ 117.233▶ 24.369**

Past practice that senior successful bidders, in case of multiple bids for same position on rotating shifts, are entitled to select shifts they prefer, is binding, where management had to be involved in scheduling employees in keeping with practice, and some grievances were filed on it.

**-- Shift preference -- Past practice▶ 119.121▶ 117.233▶ 24.369**

Past practice that senior successful bidders, in case of multiple bids for same position on rotating shifts, are entitled to select shifts they prefer, is binding, where effects on management rights to direct workforce is relatively minor, while practice gives employees peculiar personal value; practice is based on seniority, gives employees ability to work along side co-workers with whom they feel most comfortable, and gives them opportunities to make ride sharing arrangements.

**-- Shift preference▶ 119.121▶ 117.233**

Rights of senior successful bidders, in case of multiple bids for same position on rotating shifts, to select shifts they prefer, are limited, where employer has no obligation to designate shifts involved when posting vacancy, it has no obligation to make inquiries about successful bidders' shift preferences, and successful bidders have no right to bump someone who already occupies the same position on another shift; if senior bidders do not promptly state preference for particular available shift but accepts one designated by company, they have no right thereafter to expre...

**EXHIBIT**
B

shift preference retroactively.

**Attorneys**

Appearances: For the employer -- John S. Mayer, Jr., George Carter, and Randall Hampson, supervisors-human resources; James Siko, superintendent. For the union -- Ken Truex, district executive board member; Hoya Clemons, local president; Richard Wayt, local mine committeeman.

## Opinion Text

**Opinion By:**

Arbitrator: Matthew M. Franckiewicz

### SHIFT PREFERENCE

This arbitration proceeding involves whether the senior successful bidder, in a case of multiple bids for the same position on different (rotating) shifts, is entitled to select the shift he prefers, by virtue of prior practice and custom.

### Contract Provisions Involved

### ARTICLE I--ENABLING CLAUSE

* * *

WITNESSETH: It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement. It is agreed that at operations covered by this Agreement the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the Employees of the parties of the first part. It is further agreed that as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law, except in those exempted classifications of employment as hereinafter provided in this Agreement. This provision does not change the rules or practices of the industry pertaining

**Page 329**

to management. The Mine Workers intend no intrusion upon the rights of management as heretofore practiced and understood. It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement. Management will not abridge the rights of the Employees as set forth in this Agreement.

### Article IA--SCOPE AND COVERAGE

Section (d) Management of the Mines

The management of the mine, the direction of the working force and the right to hire and discharge are vested exclusively in the Employer.

### ARTICLE XVII--SENIORITY

Section (b) Reduction; Realignment

* * *

(2) Realignment Procedure

When the number of Employees within a job title is to be reduced or Employees are to be realigned, the following procedure shall apply:

(a) The senior Employees (mine seniority) in each job title shall be retained in their respective job title, regardless of shift or portal, up to the number needed in that job title.

(i) If, after such reduction of jobs within a job title, there is an excess of jobs on any shift, the excess number of junior Employees (mine seniority) on that shift will be displaced as to shift but retained within the job title.

(ii) Any Employee who is displaced within a job title will, to the extent his seniority permits, be reassigned a shift on the basis of shift preference, and for this purpose may displace any Employee

junior to him (mine seniority) on any shift within the job title. Any Employee so displaced will be reassigned in the same manner. Any Employees not displaced as to shift under this procedure will retain their prerealignment shifts.

* * *

(e) For purposes of this Realignment Procedure only, giving "shift preference" means that Employees will be assigned available jobs in the following descending order: (1) Day, (2) Afternoon, (3) Midnight, unless by the end of the meeting required by Section (c) of this Article XVII the Union informs the Employer in writing that a particular Employee has requested that some other preference be applied to him, in which case that other preference shall be followed. It is the responsibility of the Union to predetermine alternate shift preferences so as to be prepared to submit such alternate preferences at any such meeting called by the Employer.

Section (i) Job Bidding

Filling of all permanent vacancies and new jobs created during the term of this Agreement will be made on the basis of mine seniority as set forth in the following procedure:

(1) The job or vacancy shall be posted by management in a conspicuous place at all portals of the mine for a period of five (5) calendar days, but no less than three (3) production days, and will be properly identified as to portal (underground mines), job title, wage rate, at non-rotating mines as to shift, and the most recent measurement of respirable dust in the work place (underground mines). If the new job or vacancy does not yet exist, the estimated date when the job or vacancy will exist will also be posted.

* * *

(3) At the close of the posting period, upon request, the Employer shall make available to the Union panel custodian, the names of all Employees who have bid and panel members who listed the job as one for which they wished to be recalled. Within three (3) production days after the end of the posting period, the senior Employee having the ability to perform the work on the job (including panel members) making a bid for such permanent vacancy or new job shall be selected from the applicants.

* * *

Section (n) Shift Preference

When a permanent vacancy or new job is filled at a mine where shift rotation is not practiced, the Employee with the greatest seniority shall be given preference with respect to the day, afternoon and midnight shift work, on the basis of the same procedure set forth in the job bidding section of this Article.

## Article XXVI--DISTRICT AGREEMENTS

Section (b) Prior Practice and Custom

This Agreement supersedes all existing and previous contracts except as incorporated and carried forward herein by reference; and all local agreements, rules, regulations and customs heretofore established in conflict with this Agreement are hereby abolished. Except where abolished by mutual agreement of the parties, including the provisions of Article II G.10 of this Agreement, all prior practice and custom not in conflict with this Agreement shall be continued . . .

## The Facts

The McElroy mine uses rotating shifts. In any given three week period, an Employee will work one week on the 8-4 shift, one week on the 12-8 shift, and one week on the 4-12 shift. The particular rotations are designated as A, B and C. The entire shift rotates together, so that the same complement of Employees always works together, regardless of the starting time in any particular week. Likewise, the Shift Foreman rotates with the shift, so that an Employee normally reports to the same Shift Foreman, again regardless of the starting time in any particular week.

This system means that no shift obtains any advantage as to the amount of daylight work: over time an Employee will work the same amount of daylight whether he is on A or B or C

**Page 330**

shift. However, some Employees find it advantageous to be on a particular shift in the rotation, for several reasons. First, an Employee may prefer to report to one Shift Foreman rather than another.

Likewise, an Employee may find himself more compatible with the complement of Employees on one shift than another. Finally, being on the same shift with a particular individual can make car pooling or other travel arrangements possible. Some Employees live as far as 60 miles from the mine.

It is undisputed that when the Company posts jobs, it makes no designation about the shift for the posted job. It is also undisputed that after the senior qualified bidders have been determined, the Company does not inquire about the shift preferences of those bidders, but simply assigns them to shifts as it determines to be advantageous. The Union asserts, however, that a practice exists for the honoring of shift preference of senior bidders if, but only if, three factors are present:

o Multiple vacancies in the same job title are posted at the same time;

o The vacancies are on multiple shifts; and

o One of the successful bidders takes it upon himself to express a shift preference.

Under these circumstances, the Union asserts that a practice exists that the senior successful bidder is assigned to his preferred shift in the rotation.

Union witness Jesus Bustamante has been an Employee since 1972. He testified that since that time, he was aware of a practice that when there were multiple openings, the Employees with the most seniority "usually" get the shift they want. Bustamante was not personally involved in any such situation however, either as beneficiary or as victim of the practice.

Local Union 1638 President Hoya Clemons testified that since he started in 1976, the practice existed that when there were multiple bids for the same classification, the senior successful bidder was accorded shift preference if he requested a specific shift in the rotation. Clemons described two situations in which he was personally involved. In 1977, Clemons and another Employee were the successful bidders on a job. Initially Clemons was told that he would be moved to a different shift, but Clemons told Shift Foreman John Toth that he desired to stay on the same shift on which he had been. Thereafter the other bidder, who was junior to Clemons, was placed on the other shift, and Clemons stayed on the shift he preferred. In 1978 Clemons and another Employee were the successful bidders on another job. Once again Clemons expressed a shift preference to Toth, but after checking with the other Employee, who was senior to Clemons, Toth told Clemons that the other Employee wanted the same shift. As a result, Clemons did not receive his preferred shift. He testified that until the current situation, he was not aware of any instance in which a senior successful bidder in a multiple bid situation was denied a requested shift preference.

In the summer of 1995, various jobs were posted, some of which involved the same position on more than one shift. After the successful bidders were determined, some of the senior successful bidders requested that they be assigned to their preferred shifts in the rotation. The requests were not honored. Several Employees complained to the Union, and the Local Union filed a grievance. At some point, Clemons discussed the issue with Supervisor-Human Resources John Mayer. Mayer said that as far as he was concerned, the senior person would have preference of shifts. Later, Clemons spoke with Superintendent James Siko. Clemons asserted that there was a practice of giving shift preference by seniority where requested by a senior successful bidder. Siko replied that he did not have to do that, and that he was going to change that.

Prior to the events which led to the current grievance, there had been no written grievances over denial of shift preference to senior successful bidders who requested it, although there were some settlements at step one. There is no evidence that the senior successful bidder's shift preference was denied in any case in which there were postings for the same job title on different shifts, and the senior successful bidder expressed a shift preference.

The Employer offered evidence of numerous job postings since 1987, involving multiple slots within a particular job. (If a posting was made for three belt attendants, I am calling this one job and three slots.) By my count, the Company posted at least 70 jobs involving multiple slots, totalling 284 slots, from 1987 until the postings which gave rise to the current grievance. Of course, some of these postings may have involved two or more slots on the same shift, and since the postings themselves make no reference to shift, there is no way to determine from the postings themselves whether multiple shifts were involved. However, when the posting involves a multiple of three slots for a given job, it is reasonable to assume that the posting involved all three shifts. By my count, postings involving a multiple of three

**Page 331**

slots in a given job totalled 32, for a total of 144 slots during this period.

As to each of these postings, after the Company had identified the successful bidders, it never sought them out to inquire as to their shift preferences. Instead, it assigned them to shifts without regard to their relative seniority.

Employer witness Randall Hampson, who was Supervisor of Industrial Employee Relations from April 1987 until November 1990 at the McElroy mine, testified that there was no practice in effect regarding the choice of Shift Foremen.

Superintendent James Siko testified that he has the responsibility, on behalf of the Employer, for job postings and awards. As to the jobs involved in the current grievance, Siko testified that the Company was adding three additional mining crews, as well as a few other jobs. After identifying the successful bidders in accord with the Agreement, Siko assembled them into three crews, putting the Employees together in what Siko regarded as the three most efficient groupings, and then assigned one crew to each of the three shifts. Siko testified that when a bid is posted, Employees often ask what shift it would be on, and that his response is that you bid on the occupation not the crew, and there is no guarantee of where you will go if you are the successful bidder. Siko denied that there is any practice in effect which gives Employees a shift preference.

## Position of the Union

The Union concedes that the combination of circumstances necessary for the practice to apply makes it somewhat unusual, and that the lack of records as to which shifts vacancies were on which shifts makes it impossible to determine how many potential situations arose for application of the practice. The number of actual occasions in which the practice was followed would have been smaller, of course, since if a senior bidder expressed no preference, nothing happened.

The Union argues that the nature of the practice shows that it could not have developed without the knowledge and acquiescence of the Employer, and that in view of such factors as car pooling and making arrangements for child care, the practice is of personal benefit to Employees. The Union asserts that the practice existed for an extended time, spanning multiple Agreements. It points to statements of the Arbitration Review Board regarding the personal benefit of shift preference and the exercise of seniority rights. Accordingly, it argues that under the Agreement, as elaborated upon by the Arbitration Review Board, the practice must be continued unless it conflicts with the Agreement. It considers the practice to be as binding as if it were incorporated into the Agreement, and beyond the arbitrator's power to annul or modify, since only the parties, by mutual agreement, can change or discontinue a binding practice.

The Union claims that the practice is not in conflict with the Management rights recognized in Article IA Section (d). It considers that all the factors denominated by the Arbitration Review Board should be considered of equal importance, and argues that the majority of those factors favor the Union's position. It also asserts that Article IA Section (d) must be read in conjunction with the rest of the Agreement, including express and implied limitations on Management's prerogatives. It contends that under arbitration precedent, a practice is not in conflict with the Agreement, even though it may place some constraints on the Company beyond those specifically enumerated in the Agreement.

It argues that even if the practice may be considered inefficient or unproductive, such is not grounds for dishonoring the practice, since the Agreement provides for only two circumstances in which a practice is abolished: where it conflicts with a specific provision of the Agreement, and where the parties agree to change the practice. In any event, it contends that there is no evidence that continuation of the practice would have any adverse impact on operations, especially since the Agreement requires that a successful bidder must be able to step in and perform the work as soon as the award is made. The Union recognizes that a practice is undercut where the basis on which it arose no longer exists, but it asserts that the burden of showing conflict or changed circumstances is on the Company, and that the Union's burden is satisfied by showing the existence of the practice.

It asks that the Employer be directed to continue the practice.

## Position of Management

The Employer contends that, as a matter of fact, the Union has failed to carry its burden of showing that a practice exists. It argues that the Union witnesses were short on specifics, and only one Union witness claimed to have had any first hand experience with the alleged practice. It argues that if there really were a practice,

the Union ought to have been able to produce more substantial evidence than this. It characterizes the Union's evidence as indicating that on one occasion, the Company decided to change the shift designation of an Employee upon his request, and that on another occasion, it declined to change the shift of a junior Employee. It argues that it could not have designated the shifts that senior Employees wanted simply by coincidence, and that the lack of prior grievances shows an acceptance of the Employer's right to designate the shifts of successful bidders as it sees fit. It perceives the Union's proof as falling short of the standard of demonstrating an unequivocal and clearly enunciated practice.

Even assuming the existence of such a practice, the Company considers that it retains all common law rights to manage its operation, except to the extent specifically restricted by the Agreement, and that here no such restrictions exist.

It depicts the Union as seeking to permit an Employee to select his own Shift Foreman, and it argues that the Agreement, rather than providing such a right, at least implicitly denies it. It notes that Article XVII provides for identification of the shift on a job posting only at non-rotating mines, and provides for shift preference only at non-rotating mines. It views this Article as implicitly recognizing that at rotating mines, all shifts are equivalent, implying that at a rotating mine, the Employer's sole obligation is to select the senior qualified bidders. In the Employer's view, once it has done so, it is free to assign them to any shifts in the rotation.

The Company considers the establishment of a shift structure, and the scheduling of Employees, to be fundamental Management rights, and that the Agreement does not restrict the Employer as the Union contends. The Employer emphasizes that in the interest of efficiency, it must have the right to determine the makeup of crews, and the Shift Foremen to whom the crews are assigned, noting that the Union would have no valid grievance if it chose to reassign a Shift Foreman. It contends that the Union is seeking to usurp that assignment authority, by manufacturing restrictions which are neither contained in, nor consistent with, the terms of the Agreement.

It asks that the grievance be denied.

## Analysis and Conclusions
## I. General Principles

There is some overlap between the orbits of prior practices and custom (addressed in Article XXVI Section (b) of the Agreement) and Management's retained prerogatives (addressed in Article I and Article IA Section (d) of the Agreement). The Arbitration Review Board has discussed the interaction of these provisions, and a review of the principles it has expressed, binding on this arbitrator, is in order.

The Arbitration Review Board observed that in a case involving prior practice, the arbitrator's first task is to determine whether, as a matter of fact, the practice has been proved, and if so what are the boundaries of its applicability:

The Board has also dealt with another important facet of past practice, that of finding the existence of such a practice and its scope and manner of creation even before reaching the question of whether as sought to be applied, it conflicts with the Agreement.

* * * [P]reliminary inquiry must be directed to the factual determinations about the existence of the alleged past practice. Those determinations are not only to be concerned with the proof of the fact that there was a past practice, but also closely related matters often making up the amalgam of facts determinative of whether there was a past practice, but also outlining and defining the nature and extent of the past practice. . . . [A]rbitrators and advocates alike must be concerned with a first principle that the party claiming a past practice has the obligation to assume the burden of persuasion that there was a past practice and what its nature and scope of coverage and application may be. That proof should show that the practice is unequivocal, clearly enunciated and acted upon, and readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both parties.

ARB Decision No. 78-2, pages 9-10.

Of course, the existence of the practice only begins the inquiry. Not all patterns of behavior which have been consistently followed in the past create the obligation of repetition in the future. In this regard, the Arbitration Review Board has distinguished binding practices on the one hand, from what may be called habit or happenstance on the other hand. It quoted with approval the decision of

arbitrator Harry Shulman in *Ford Motor Company,* 19 LA 237:

But there are other practices which are not the result of joint determination at all. They may be mere happenstance, that is, methods that developed without design or deliberation. Or they may be choices by Management in the exercise of managerial

**Page 333**

discretion as to the convenient methods at the time. In such cases there is no thought of obligation or commitment to the future. Such practices are merely present ways, not prescribed ways, of doing things. The relevant item of significance is not the nature of the particular method but the managerial freedom with respect to it. Being the product of managerial determination in its permitted discretion such practices are, in the absence of contractual provision to the contrary, subject to change in the same discretion.

ARB Decision No. 78-2, page 6. See also ARB Decision No. 78-3, page 5 in this regard.

The Arbitration Review Board also stressed the importance of a careful examination of whether continuation of the practice would contravene any portion of the Agreement; such conflict is "the touchstone upon which continuance of a practice depends." ARB Decision No. 78-3, page 4. Of course, an alleged practice may conceivably violate any provision of the Agreement, but typically the potential conflict is with the retained Management rights provisions of Article IA Section (d) and the Witnesseth clause in Article I, particularly with regard to assignment of work. As to matters committed to Management discretion, the Arbitration Review Board has said:

The assignment of work and determining the most efficient and practical way to perform that work by alignment of the work force and deciding what work will be performed and when in relation to other necessary work is peculiarly reserved to the sound discretion of the Employer by specific provision in the Agreement.

ARB Decision No. 78-2, page 11.

In addressing the scope of Management rights, although in the context of arbitral remedial authority rather than prior practice, the Arbitration Review Board observed:

The management of the mine and direction of the working force include, among other things, the determination of what work is to be done, when it is to be done, by whom it is to be done, and what duties are to be assigned to what jobs or personnel. There are, of course, limitations on the all inclusive and fully discretionary exercise of those management functions. . . . However, the point is that with all those limitations, there still remains the management right to organize and determine the manner in which work functions are to be performed, and if performed by classified employees, what classified jobs exist or are to be created for the performance of the work by classified employees.

ARB Decision No. 78-26, page 14.

While the question of whether a practice is binding or represents merely habit or happenstance, and the question of conflict with Management's rights to assign work are conceptually separate (see ARB Decision No. 78-3, page 7), the factors which are to be considered in the resolution of these issues are often the same. The Arbitration Review Board has provided practical guidance for arbitrators in the resolution of these issues. The arbitrator should draw a distinction between benefits of a "peculiar personal value" to Employees, and practices relating to a "basic management function." ARB Decision No. 78-2, page 7. The Arbitration Review Board expanded upon the factors for the arbitrator to consider in this regard:

In reaching a determination of the fact of the existence of the past practice, the equally important factors of the nature of the practice as involving direction of the working force or benefit of peculiar personal value to employees, and the manner it is claimed to have come into being, for instance, whether by express direction or deliberate repetition of a way of doing things; whether knowledge of claimed right arising out of the practice has ever been brought out in any dealings between the parties, such as in grievance proceedings; or whether the way of doing things simply occurred either by one party neglecting to assert right or authority or as in the case in Decision No. 26, as an expedient happenstance without 'thought of obligation or commitment to the future.' In many cases, elements of reasonable reliance under all the circumstances will be substantial factors to be considered and *argued*.

ARB Decision No. 78-2, pages 10-11. See also ARB Decision No. 78-3, page 5.

## II. Was the Existence of a Practice Proven?

Union witness Hoya Clemons provided evidence that on two prior occasions affecting himself, the practice alleged by the Union was followed. Although at least one arbitrator has found that a practice existed based on only two occurrences, see Monterey Coal Co. Monterey No. 1 Mine, No. 12-77-371 (Sinicropi, 1978), that decision preceded the issuance of ARB Decision No. 78-2, and I doubt that proof of only two prior incidents is enough to satisfy the burden of adducing sufficiently clear and unequivocal evidence that a practice exists.

The Union also provided hearsay evidence, through Clemons and Jesus Bustamante, that the practice existed. While hearsay is admissible in arbitration proceedings, its use in a past practice case is particularly problematical. This is because of the importance, as stressed by the Arbitration Review Board, of clearly establishing the parameters of the practice, and the circumstances in which it applied or did not apply. A person who has only second

**Page 334**

hand or third hand information about the practice may not be able to provide an accurate account of the background to the events which allegedly demonstrated the existence of the practice.

If the only evidence of the existence of the practice were the two specific occurrences, *supplemented by* hearsay testimony, I would be most reluctant to find that the Union had satisfied its burden of proof that the practice had been followed. There is, however one additional fact to be considered.

It is undisputed that when Clemons spoke to Superintendent Siko about the bid postings involved in the current case, Clemons asserted that a past practice existed of giving bid preference if requested by the senior bidder. Siko replied that he did not have to do it that way, and that he was going to change it. There are times in arbitration when a single word can be critical, and this is such a case. The crucial word is "change." By saying that he was going to change it, Siko was acknowledging that the practice did exist, while asserting that he was not obligated to continue the practice, on the basis of retained Management prerogatives. While the Management rights aspect of the case will be addressed below, for purposes of demonstrating the existence of the practice, this acknowledgement, together with the other evidence discussed above, is sufficient to sustain the Union's burden of proof.

It is apparent that not all Employees who could have taken advantage of the practice did so. But the failure of some Employees to claim the benefit of a prior practice does not negate the existence of the practice. See Bethlehem Mines Corp. Mine Nos. 51, 58 and 60, No. 51-81-82 (Parkinson, 1983) (115 of 420 eligible Employees had taken advantage of the practice).

As to the scope of the practice, I believe that it was accurately described by the Union: when there were multiple simultaneous postings for the same job title which involved vacancies on different shifts, and a senior successful bidder requested a particular shift in the rotation, that request was honored.

## III. Was the Practice Binding?

As noted above, a prior practice, even if adequately proven, creates no obligation to continue the practice where the practice lacks the hallmarks of mutual acceptance, and constitutes merely Management habit or happenstance. In addition, a practice, even if mutually accepted, need not be followed if it conflicts with any provision of the Agreement.

The practice involved herein is not one which could have evolved through inadvertence, happenstance or neglect. When a senior bidder requested a particular shift, Management did not simply sit by idly as the Employee reported on that shift. The Company had to be actively involved in arranging for the senior Employee to be scheduled on that shift, and for the junior Employee to be placed on a different shift. "Active participation" by the Company in the development of the practice suggests that the conduct is a binding practice rather than a mere managerial habit. ARB Decision 78-3, page 6. For much the same reason, the practice cannot be viewed as one in which the Company simply chose to exercise its discretion in a particular manner. There appear to have been situations in which the Company designated successful bidders to specific shifts, but altered the preliminary designation after a senior bidder requested a particular shift. Thus it appears that at times the Employer had already exercised its discretion in choosing shifts for the successful bidders, but revised its choice to accommodate the senior bidder.

The factors of reliance and knowledge, although not of great significance under the facts of this case, also provide some support for finding the practice to be a binding one, rather than mere habit or happenstance. The record shows that some grievances were filed on the basis of the practice,

although none progressed beyond step one. Of course, under Article XXIII Section (c) of the Agreement, a step one settlement does not constitute a precedent. But the fact that the grievances were filed demonstrates that the Grievants in those cases were aware of the practice, and suggests that they may have relied on it in making their decisions to bid on the posted positions. Accordingly, I conclude that the practice was binding, unless in conflict with some provision of the Agreement.

On the question of whether the practice is inconsistent with the Agreement, I note preliminarily that the Employer contends that the practice would be at odds with Article XVII Sections (i) and (n). Section (i) requires that the shift be listed in a job posting at a non-rotating mine, and Section (n) requires that the senior Employee be given shift preference at non-rotating mines when vacancies are filled. Neither Section, either explicitly or by necessary implication, precludes an employer operating a rotating mine

**Page 335**

from following shift preference on the basis of seniority. Nor can I find anything in these Sections which increases the degree of discretion which the Company would otherwise have possessed on the basis of Article I and Article IA Section (d). Thus in the present case, resolution of the issue turns on the interplay between Articles I and IA Section (d) on the one hand and Article XXVI Section (b) on the other, and the Company's position is neither strengthened nor weakened by Article XVII. This conclusion is in accord with the decision of an arbitrator in a case in which it was claimed that a practice existed which permitted lateral bidding to a vacancy on a different shift at a rotating mine. The arbitrator stated:

The Arbitrator agrees with the Union's contention that a practice permitting lateral bids in rotating mines could have been binding. Although the Agreement did not require mines like Powhatan No. 5 to acknowledge bids of the kind that Grievant was attempting to exercise, it did not preclude the possibility of a practice permitting bids of this kind. If such practice existed it would have been binding. It would not have conflicted with any of the language of the Agreement and, therefore, Article XXVI, Section B would have prohibited its unilateral abandonment.

North American Coal Corporation Powhatan No. 5 Mine, No. 78-6-78-169 (Dworkin, 1984), page 7. (The arbitrator denied the grievance on the basis that the Union had failed to sustain its burden of proving the existence of the alleged practice.) See also Consolidation Coal Co. McElroy Mine, No. 84-6-87-759 (Stoltenberg, 1988), pages 7-8 (absence of contractual language regarding format of job bid did not mean that the format was committed to managerial discretion).

This brings us squarely to the pivotal issue in this case, whether the practice contravenes Management's retained rights under Article I and Article IA Section (d).

As the Arbitration Review Board has noted, a number of factors must be considered in resolving this question, some of which have already been discussed. One key consideration, emphasized by the Arbitration Review Board, is the distinction between benefits of a peculiar personal value to Employees, and restrictions on Management's ability to direct the work force. These are not mutually exclusive concepts, and most disputed practices, at least those which reach arbitration, will involve aspects of both. Thus the task for an arbitrator is not to try to make an either/or determination between whether the practice is in the peculiarly personal value category, or the undue restriction on Management category. Rather the arbitrator's task is to weigh the relative strengths of both aspects of the practice, since most practices will partake of both.

An Employee's claim of a benefit on the basis of seniority is often a significant indicator that the practice at issue is one involving a benefit of peculiar personal value, as the Arbitration Review Board has recognized. ARB Decision No. 78-2, pages 11-12. In this case, seniority was the basis for the request for shift preference.

An examination of the reasons why Employees prefer one of the rotating shifts rather than another also discloses some aspects of peculiar personal value. I do not regard the preference for a particular Shift Foreman as significant in this respect. Since the Company has every right to reassign its Shift Foremen as it sees fit, there can be no guarantee that the Employee will continue to be assigned to the Shift Foreman he prefers. The ability to work along side co-workers with whom the Employee feels most compatible seems to have more of the flavor of a personal benefit. But clearly of most significance in this respect is the ability to make ride sharing arrangements. If, by virtue of working on the same shift as others with whom he can share a ride, an Employee saves an average of 10 miles to work, this amounts to a savings of 100 miles a week. If we use the current Internal Revenue Service mileage allowance ($.30) as the value of a mile travelled, then the ability to car pool is worth $30.00 a

week to the Employee. See Quarto No. 4, No. 81-6-84-968 (Abrams, 1984), in which practice was held to preclude the Employer from assigning certain Employees, without regard to seniority, to a different portal, which would involve an additional 5.5 miles of travel, although the Employer asserted that the basis for the selection was efficiency and safety. In the current case, I conclude that continuation of the practice has meaningful personal value to the Employees affected.

By contrast, I view the effects of the practice on Management's ability to direct the work force as relatively minor. Despite the practice, Management still makes "the determination of what work is to be done, when it is to be done, by whom it is to be done, and what duties are to be assigned to what jobs or personnel." The Company still decides whether or not a job needs to be filled. The Company still decides whether that vacancy should be filled on A shift or B shift in the rotation. The Company still decides on a day to day basis whether a particular task is

**Page 336**

to be performed on daylight or on midnight. The Company (subject to the provisions of the Agreement) still decides whether one Employee or another carries out a particular assignment. Of course if the Company desires to have a particular Employee perform a specific task at a particular time, the practice has an impact, since the Employee may be on a different shift in the rotation. But it is not so much the practice as the fact that no Employee works all 24 hours of the day, which may cause Management to have to choose between the time a task is done, and the specific Employee who does it.

An examination of the holding in ARB Decision No. 78-2 is instructive here. In that case, masons had normally worked on steady daylight shift, and the Union asserted that by virtue of practice, the Employer was precluded from establishing a system of rotating shifts. The Arbitration Review Board held that the Employer could establish multiple shifts, but that the practice restricted the Employer to the use of steady, rather than rotating, shifts. Thus to forbid the Employer from deciding that masonry work would be done on afternoon or midnight shifts was too great an infringement on Management's rights. But the practice of using steady shifts was to be followed, even though it necessarily affected which individuals were available to do the work at any given time. I see the restriction on the Employer's prerogative in the present case as no greater than what the Arbitration Review Board upheld in that case. McElroy Coal Co., No. 88-6-90-554 (Lieberman, 1990), relied upon by the Employer, involves essentially the same issue as ARB Decision No. 78-2, in that it finds invalid a claimed practice which would preclude the Company from switching from steady afternoon to steady midnight shift for certain Employees.)

In the current case, the Employer contends that the grievance amounts to a claim that Employees have the right to select their Shift Foremen. Of course, in any job bidding or shift preference situation, the identity of the Shift Foreman may be a factor in the Employee's decision. If the identity of the Shift Foreman were the basis for the practice, I would be inclined to conclude that the restriction on Management's ability to direct the work force overcame the aspect of personal benefit to the Employee and that the practice conflicted with the Agreement. But that is not the basis for the practice. A senior successful bidder chooses a shift in the rotation, not the Shift Foreman. If the Employee voices a preference for B shift, and thereafter the Company decides to move the B Shift Foreman to C shift, the Employee is stuck on B shift, reporting to whomever the Company designates as the new B Shift Foreman.

There is a superficial similarity between the current case and Peabody Coal Co. Camp #2, No. 84-23-86-38 (Volz, 1986). In that case a rotating mine had used two Employees as continuous miner operators on the No. 4 vein. It decided to add two continuous miner operators on the No. 11 vein, and posted two openings, without designation as to shift or location. Of the two successful bidders, the senior preferred the B shift at No. 11, and the Grievant, the junior, preferred the A shift at No. 11. The Union claimed that, by virtue of practice, both bidders ought to obtain the shift they preferred. However, the Company moved the B shift operator from the No. 4 vein to the A shift at No. 11, with his consent, and placed the Grievant on the B shift at No. 4. Thus the Grievant did not receive the shift of his choice. The arbitrator did not decide that any practice of shift preference would have been improper in the circumstances. Instead, he concluded that the Company had the right to determine what openings existed and where they existed. After the transfer of the operator from No. 4 to No. 11, the Company determined that there was one opening on No. 11 on B shift, and one opening on No. 4 on B shift. As the junior successful bidder, the Grievant would have had no choice in any event, and was properly assigned to B shift on No. 4. Thus the only way for the Grievant to prevail would be to say that the Company could not make the determination that there was one vacancy on No. 4 on B shift, and one vacancy on No. 11 on B shift, but that determination was committed to the Company's

discretion under the Agreement. In the current case, as in the cited case, the Employer has the sole right to determine what openings exist, when they exist, and on what shift they exist. But once the Company has made the determination that there are vacancies in the same classification on different shifts in the rotation, the senior successful bidder, by virtue of prior practice, is entitled upon request, to be placed on the shift of his choice.

Based on the above, I conclude that the practice was a binding one, and not in conflict with the Agreement. Accordingly, under Article XXVI Section (b) the Employer was obliged to continue it.

**Page 337**

## AWARD

The grievance is sustained. The Company shall comply with the prior practice of giving shift preference to senior successful bidders, upon their request, in situations where multiple openings are posted simultaneously for the same job title, involving vacancies on different shifts.

In view of the importance of the precise scope of a prior practice, it is worthwhile to stress some aspects which are not within the scope of the practice. First, when posting a vacancy, the Company has no obligation to designate the shift(s) involved. Second, the Employer has no obligation to make inquiries about the successful bidders' shift preferences; the burden is on the senior successful bidder to express his preference to the Company. Third, in situations in which there is only one opening in a particular classification, or all the openings are on the same shift in the rotation, the successful bidders simply fill those openings on that shift. There is no right to bump someone who already occupies the same position on another shift, even if junior to the successful bidder, by virtue of the practice. Similarly, if there are openings on different shifts, and the senior bidder does not promptly state a preference for a particular shift but simply accepts the one designated by the Company, he has no right thereafter to express a shift preference retroactively by bumping a junior Employee, even if both Employees initially bid on the same position at the same time.

Jurisdiction is retained for the limited purpose of resolving any disagreements which may arise concerning the application of this award.

- End of Case -

Contact customer relations at: customercare@bna.com or 1-800-372-1033

ISSN 1527-7356

Copyright © 2008, The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy.
http://www.bna.com/corp/index.html#V